******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ALEXANDER A. GARRISON
## (AC 43796)

Prescott, Suarez and Bishop, Js.

*Syllabus*

The defendant, who had been convicted, after a trial to the court, of the crime of assault in the first degree, appealed to this court, claiming that the trial court had improperly denied his motion to suppress certain statements he made to police officers while he was in a hospital examining room where he was attached to an intravenous line. The defendant claimed that the statements were inadmissible because they were the product of custodial interrogation, and the police had not advised him of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436). The state disagreed and claimed that, even if the police were required to advise the defendant of his rights pursuant to *Miranda*, the admission of his statements at trial was harmless beyond a reasonable doubt. The defendant had visited P and another man at their apartment, where the men consumed beer and whiskey and socialized. The men became highly intoxicated. An argument ensued, and P punched the defendant in the face. The defendant thereafter attacked P from behind and stabbed him six times with a knife. The defendant then walked to a nearby hospital. He was brought to the examining room, where he remained that evening and into the early morning for about four and one-half hours. The attending physician did not permit him to be discharged until he regained sobriety. At various times, five different police officers conducted multiple rounds of questioning of the defendant in his hospital room, during which he made inculpatory statements. One of the officers also transcribed the defendant's version of the events at issue, placed him under oath, instructed him to sign the written statement and then left the hospital room. The officer returned later and informed the defendant that he was free to leave the hospital but only if the medical staff allowed him to do so. None of the officers ever advised the defendant of his rights pursuant to *Miranda* or told him that he was under arrest or that he could terminate the interviews at any time. The questioning by the officers lasted, collectively, about one hour. Some of the officers wore plain clothes; others were in uniform and visibly armed with their service weapons. Several officers were in the defendant's room at the same time during three of the interviews. Hospital security guards and medical staff also were in the room during some of the questioning. The trial court denied the defendant's motion to suppress, reasoning that he had failed to prove that he was in custody for purposes of *Miranda* and that a person in his position would have understood that his freedom of action was curtailed to a degree associated with a formal arrest. *Held*:

1. Contrary to the trial court's determination, the defendant was in police custody for purposes of *Miranda*: the police did not explain to the defendant that they were not holding or detaining him until more than two hours after their first encounter with him, at no point did they inform him that he was free to stop answering their questions, and the police dominated atmosphere in his hospital room, with multiple officers entering and exiting for numerous rounds of questioning at various points throughout the evening, created a large and intimidating police presence that could undermine an individual's decision to remain silent; moreover, this court was unpersuaded that the factors that militated against a finding that the defendant was in custody outweighed the coercive features of his detention, as five different police officers repeatedly questioned him for one hour, collectively, during the late evening into the early morning hours, the surroundings in which the questioning took place were not familiar to the defendant, who had a tenth grade education and was intoxicated during the questioning, and, although the defendant was alert enough to be able to converse with the police and the medical staff, in light of the police dominated atmosphere, his ability to request assistance from the medical staff to terminate the police interrogation did not mean that a reasonable person in his position

would believe he was at liberty to do so; furthermore, a person in the defendant's position reasonably would have believed he was in police custody to the degree associated with a formal arrest, as the defendant was presented with inherently coercive pressures that included the officers' conduct, which conveyed a clear message of complete, unfettered and temporally indefinite police control, the restraint the medical attendants imposed on him for purposes of his treatment, and of which the police took advantage, and the extensive duration of the questioning by multiple police officers and their failure to advise him that he was free to terminate the interviews.

2. The police officers' questioning of the defendant constituted the functional equivalent of interrogation for purposes of *Miranda*, and the police were required to advise him of his rights pursuant to *Miranda* before eliciting statements from him and should have known that their questions reasonably were likely to elicit incriminating statements; the officers repeatedly asked the defendant to provide his version of the altercation with P, their questions were not objectively neutral and unrelated to the altercation but implied that the defendant was involved in it and explicitly called for responses regarding the altercation, for which he was later prosecuted, and, despite the testimony of one of the officers that he did not advise the defendant of his *Miranda* rights prior to taking his statement because, in the officer's mind, the defendant was not a suspect, the officer's subjective understanding of whether the defendant was a suspect did not overcome the strong, highly relevant relationship between the questions asked by all of the officers and the crime committed.

3. Contrary to the state's contention, the admission of the defendant's inculpatory statements at trial was not harmless beyond a reasonable doubt, and, therefore, the defendant was entitled to a new trial: this court could not say that the defendant's statements were relatively benign or facially innocuous, as the trial court explicitly relied on at least one of them in determining that the state had proven beyond a reasonable doubt the element of intent, a requisite element of the charge of assault in the first degree; moreover, the state extensively cross-examined the defendant at trial as to several of the statements he made to the police and recited them to the jury at the conclusion of the trial; furthermore, the court's analysis of the defendant's claim of self-defense may have been influenced by many of the defendant's statements, which incriminated him with regard to various elements of that claim and may have had a tendency to demonstrate that he ignored any duty to retreat he may have had.

Argued January 10—officially released July 19, 2022

*Procedural History*

Information charging the defendant with the crimes of assault in the first degree and tampering with physical evidence, brought to the Superior Court in the judicial district of Tolland, where the court, *Bhatt*, *J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the court, *Seeley*, *J.*; subsequently, the court, *Seeley*, *J.*, granted the defendant's motion for a judgment of acquittal as to the charge of tampering with physical evidence; judgment of guilty of assault in the first degree, from which the defendant appealed to this court. *Reversed*; *new trial*.

*Erica A. Barber*, for the appellant (defendant).

*Sarah Hanna*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Jaclyn Preville*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Alexander A. Garrison, appeals from the judgment of conviction, rendered following a bench trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The defendant claims that the trial court improperly denied his motion to suppress statements that he made to police officers while he was at a hospital because the statements (1) were made as a result of custodial interrogation and he had not been advised of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), at the time he made the statements, and (2) were involuntarily given.[1] We agree with the defendant that the police obtained his statements as a result of custodial interrogation without providing to the defendant the advisement required by *Miranda*, and, therefore, the court improperly denied his motion to suppress. We further agree that the defendant was prejudiced by the admission of his statements and, accordingly, reverse the judgment of conviction and remand the case for a new trial.

Before setting forth the relevant facts and procedural history, we first set forth the applicable standard of review of a trial court's determination as to whether a person was "in custody" for *Miranda* purposes. "The trial court's determination of the historical circumstances surrounding the defendant's interrogation [entails] findings of fact . . . which will not be overturned unless they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 197, 85 A.3d 627 (2014); see also *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016) ("we must, of course, defer to [a] trial court's factual findings"). If, however, "a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . and the credibility of witnesses is not the primary issue"; (internal quotation marks omitted) *State* v. *Castillo*, 329 Conn. 311, 321, 186 A.3d 672 (2018); "our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether [each] finding is supported by substantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Edmonds*, supra, 39; see also *State* v. *Mullins*, 288 Conn. 345, 362, 952 A.2d 784 (2008) (employing same standard of review over trial court's conclusion that defendant was not subjected to custodial interrogation), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013). Thus, "[i]n order to determine the [factual] issue of custody . . . we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 197.

Our Supreme Court in *Edmonds* described this standard as requiring "a more probing factual review . . . ." (Internal quotation marks omitted.) *State* v. *Edmonds*, supra, 323 Conn. 39. Specifically, our Supreme Court explained, in scrupulously examining the record to ascertain whether the court's finding is supported by substantial evidence, "we are bound to consider not only the trial court's factual findings, but also . . . *we must take account of any undisputed evidence that does not support the trial court's ruling . . . but that the trial court did not expressly discredit.*" (Emphasis added; internal quotation marks omitted.) Id. In *Edmonds*, our Supreme Court reviewed the trial court's factual findings, as well as the undisputed testimony and evidence in the record, to resolve factual ambiguities in the court's decision.[2] See id., 44–46.

"The ultimate inquiry as to whether, in light of [the] factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo. . . . In other words . . . we exercise plenary review over the ultimate issue of custody." (Citation omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 197.

We now turn to the present case. The following procedural history and facts, either found by the court, *Bhatt, J.*, and set forth in its memorandum of decision on the defendant's motion to suppress, or found by the court, *Seeley, J.*, and set forth in its memorandum of decision, and as "supplemented by the undisputed [evidence]" in the record; *State* v. *Edmonds*, supra, 323 Conn. 39; are relevant to our resolution of this appeal. During the early evening hours of June 22, 2018, the defendant arrived at the apartment of his friend, Timothy Murphy, located in Vernon. William Patten, Murphy's cousin, also resided in the apartment. Murphy had invited the defendant to sleep at the apartment because the defendant had been staying at a local shelter. Murphy, Patten, and the defendant initially watched television, talked, and played guitar in the living room of the apartment, during which time they consumed beer and whiskey.

At approximately 6 p.m., Murphy, Patten, and the defendant decided to move to the lawn outside of the apartment. They built a fire pit and continued to drink beer and whiskey for several hours. Eventually, the men became highly intoxicated.[3] Later in the evening, Patten and the defendant began to argue, exchanging insults and offensive language. Eventually, the disagreement became physical; Patten and the defendant began to " 'tussl[e],' " pushed one another and, at some point, fell onto the ground near the fire pit. Patten gained an advantage over the defendant and punched him in

the face.

After Patten punched the defendant, the pair stopped fighting, stood up from the ground, and sat around the fire once more. After a few minutes, the defendant attacked Patten from behind and, specifically, stabbed Patten in his back, front shoulder area, and arm using a Smith and Wesson folding knife.[4] In response, Patten grabbed the defendant's shirt and arm, pulled the defendant over his shoulder, and kicked the defendant away. This second altercation lasted approximately thirty seconds.

After the defendant stabbed Patten, Patten reentered his apartment. While Patten was inside, Murphy confronted the defendant and asked him what had happened. The defendant did not answer Murphy's question; instead, he stated repeatedly that he had blood on his body.

Meanwhile, Patten attempted to tend to his wounds inside of the apartment. He observed exposed muscle and tissue on his left arm and was unable to stop his wounds from bleeding. Patten then walked to Rockville General Hospital in Vernon (hospital), which was located approximately 500 yards from the apartment. Once he reached the hospital, he sat down outside of the building. He remained outside of the hospital until a hospital employee found him at approximately 9:45 p.m. Patten's injuries were determined to be life threatening, as he had lost approximately 30 to 40 percent of his blood volume. He later was transferred via a Life Star helicopter to Saint Francis Hospital and Medical Center in Hartford to receive additional care.

Back at the apartment and at some point after Patten had reentered the apartment following the second altercation, Murphy went inside to look for Patten. Murphy became nervous, however, when he observed a large amount of blood in the bathroom and could not find Patten. Murphy returned to the fire pit area and once again asked the defendant what had happened. Murphy additionally told the defendant to leave and said that he was going to call the police.

Before the defendant left the property, he threw the knife into an adjacent yard.[5] The defendant then walked to the hospital and arrived at approximately 9:42 p.m. A registered nurse, Sarah Hoyle, transported the defendant in a wheelchair to a hospital examining room and began to evaluate him. The defendant reported to the hospital staff that he had been struck in the nose and had sustained a brief loss of consciousness. He also informed the hospital staff that he was experiencing nasal pain and nasal swelling. The defendant was admitted, and the hospital conducted computed tomography (CT) imaging on his nose. The CT imaging revealed that the defendant had sustained a broken nose.

Due to the defendant's level of intoxication, the

attending physician on duty that evening, Sarah Rajchel, mandated that the defendant be discharged from the hospital only after he became clinically sober. Thus, medical staff prohibited the defendant from leaving the hospital until he regained sobriety. Although the defendant "clearly [was] intoxicated," he was able to communicate with medical staff and others.

The defendant changed into a hospital gown, which he wore throughout the evening, and the hospital staff collected his clothes and other belongings and placed them into bags. At approximately 11 p.m. that evening, police officers, who had arrived at the hospital earlier in the evening, requested that the defendant sign a consent form, allowing the police to seize and search his clothing. After the defendant signed the consent form, the police seized his clothing.

Several police officers—including Officer Ethan Roberge, Officer Thomas Bugbee, Detective Charles Hicking, Detective Michael Patrizz, Sergeant Christopher Pryputniewicz, and Detective Sergeant David Hatheway of the Vernon Police Department—were dispatched to the hospital throughout the evening. Between approximately 9:42 p.m. on June 22, 2018, the time at which the defendant arrived at the hospital, and shortly before 2:30 a.m. on June 23, 2018, the time at which he was discharged from the hospital, five of the officers questioned the defendant at various points during the evening. The multiple rounds of police questioning of the defendant collectively lasted approximately one hour. During three of the interviews, several police officers stood in the defendant's hospital room at the same time.

Roberge, the first officer to arrive at the hospital, was dispatched to the hospital at approximately 9:42 p.m. and arrived shortly thereafter. He wore a police uniform, and his service firearm was visible. Before entering the defendant's hospital room, Roberge unsuccessfully attempted to interview Patten, who, at that time, was unconscious in a nearby hospital room. Roberge then entered the defendant's hospital room and questioned the defendant from approximately 9:49 p.m. until 9:54 p.m.[6] Although Roberge was the only police officer in the hospital room during this interview, two hospital security guards also were present in the room. Medical staff were present in the room as well. At no point prior to or during his conversation with the defendant did Roberge advise the defendant of his *Miranda* rights or inform the defendant that he was free to leave.

At the conclusion of their conversation, Roberge exited the defendant's hospital room and, upon exiting the room, had a conversation with two other officers on the premises.[7] At some point after he exited the defendant's room, Roberge then entered *Patten*'s hospital room to attempt to speak with him. Before he asked *Patten* any questions, Roberge advised *Patten* of his rights pursuant to *Miranda*.

At approximately 9:47 p.m., Hicking arrived at the hospital, dressed in plain clothes. His service weapon was not visible. Hicking entered the defendant's room, asked the nurse in the room if he could speak with the defendant, and subsequently began to question the defendant.[8] The defendant recounted his altercation with Patten to Hicking, and Hicking asked the defendant clarifying questions as to his version of events. During the conversation, the defendant stated, inter alia, "I take shit from no one." At some point, nursing staff interrupted the conversation between Hicking and the defendant to perform medical duties. At no point prior to or during his conversation with the defendant did Hicking advise the defendant of his *Miranda* rights or inform the defendant that he was free to leave.

Bugbee also was dispatched to the hospital and arrived in uniform, with his service weapon visible. Upon his arrival, Bugbee conferred with the other officers present at the hospital and subsequently entered the defendant's hospital room. Bugbee entered the defendant's room as Hicking was questioning the defendant about the altercation. Hicking ordered Bugbee to take a statement from the defendant, then exited the room. Bugbee told the defendant that he would take a statement, that the defendant should tell him what had happened, and that he would write down the defendant's version of events.[9] During this initial interaction, the defendant stated to Bugbee, inter alia, "I don't flight, I fight," "I'm a peaceable person until you get in my face, then I fuck you up," and, "I take shit from no one." Additionally, during this interaction between Bugbee and the defendant, Hoyle entered the defendant's hospital room and inserted an intravenous (IV) line into the defendant.[10] After approximately thirty minutes, during which the defendant recounted the altercation and Bugbee transcribed the defendant's version of events, Bugbee placed the defendant under oath, instructed the defendant to sign the written statement that he had transcribed, and exited the hospital room. At no point prior to or during this conversation did Bugbee advise the defendant of his *Miranda* rights or inform the defendant that he was free to leave.

At approximately 11:07 p.m., Bugbee reentered the defendant's room alongside Hatheway, who also had responded to the hospital. Hatheway was wearing plain clothes, but his badge and service weapon were visible. Hatheway questioned the defendant about the defendant's version of events, and Bugbee remained in the room during the interview.[11] At no point prior to or during his conversation with the defendant did Hatheway advise the defendant of his *Miranda* rights or inform the defendant that he was free to leave.

At approximately 12:09 a.m., Bugbee informed the defendant for the first time that, "as far as the police were concerned," the defendant was free to leave the

hospital, but only if hospital personnel allowed him to leave. At 12:26 a.m., Bugbee again reiterated that, as far as the police were concerned, the defendant was free to leave, subject to the hospital's directive that the defendant could not leave the hospital until after he became clinically sober.[12] The defendant stated to Bugbee that he understood the hospital directive that he could not leave until after he became sober. Bugbee remained at the hospital until he was informed by police Lieutenant Lucas Gallant that the defendant would not be arrested that evening. Bugbee did not advise the defendant of his *Miranda* rights at any point during the evening.

Patrizz arrived at the hospital after first responding to the scene of the apartment. He wore plain clothes, but his badge and service weapon were visible. At approximately 1:30 a.m., he and Hicking entered the defendant's room, and Patrizz began to question the defendant.[13] Patrizz asked the defendant to provide his version of events. After approximately five to ten minutes, the defendant expressed frustration at the fact that he had to repeat his story multiple times and indicated that he did not want to speak to the officers anymore. Patrizz and Hicking left the hospital at approximately 2 a.m. At no point prior to or during their conversation did Patrizz advise the defendant of his *Miranda* rights or inform the defendant that he was free to leave.

The defendant provided several statements, including inculpatory admissions, to the police throughout the evening. The defendant recounted his version of events. He told the police that he "wasn't in the right" for stabbing Patten, then stated, "I mean, look at what he did," while pointing at his nose. He also told the police, "I take shit from no one, you swing at me, I'm going to end you." The defendant additionally stated, "I'm a peaceable person until you get in my face, then I'll fuck you up," "[w]hen it comes to fight or flight, I fight," and, "[h]onestly, I can't take shit from no one." The defendant was not advised of his *Miranda* rights at any point while he was at the hospital.

The defendant was arrested on June 24, 2018, and arraigned the following day on June 25, 2018. The defendant was charged with one count of assault in the first degree in violation of § 53a-59 (a) (1) and one count of tampering with physical evidence in violation of General Statutes § 53a-155.

On April 22, 2019, the defendant moved to suppress portions of the statements that he had given to the police at the hospital. Specifically, he sought to suppress the verbal statements that he made to Hicking, Bugbee, Hatheway, and Patrizz.[14] He also sought to suppress the written statement transcribed by Bugbee. The defendant contended, inter alia, that the statements were inadmissible because they were the product of custodial interrogation, and he had not been advised

of his rights pursuant to *Miranda* v. *Arizona*, supra, 384 U.S. 478–79.[15] In memoranda of law in support of his motion to suppress, the defendant argued that a reasonable person in his position would not have believed he was free to leave and that, under the circumstances, he was in custody for purposes of *Miranda*. Because the police had not advised him of his *Miranda* rights before eliciting his statements, the defendant contended that his statements were inadmissible. In its response to the defendant's motion to suppress, dated May 20, 2019, the state maintained that the defendant neither was in custody, nor subjected to police interrogation at the hospital.

The court, *Bhatt, J.*, held a hearing on the defendant's motion to suppress on May 8, 9 and 13, 2019. Following the conclusion of the hearing, the court issued a memorandum of decision, dated June 5, 2019, denying the defendant's motion to suppress the statements. The court concluded that the defendant had failed to prove that a reasonable person in his position would have understood his freedom of action to be curtailed to a degree associated with a formal arrest.

In so concluding, the court noted that the police did not transport the defendant to, or themselves physically restrain the defendant at, the hospital. The court stated that the police did not request that medical staff cease administering treatment to the defendant or prolong his treatment; by contrast, the police "appeared to defer" to the medical staff's treatment plan. The court also noted that the defendant conversed freely with the medical staff and police officers who entered his hospital room and found that the defendant was "coherent, alert, oriented, and able to communicate fully and effectively" throughout his time at the hospital. The court further noted that, although the police did not inform the defendant that he was free to leave prior to 12:09 a.m. or that he could terminate the interviews, the police did not tell the defendant that he was *prohibited* from leaving when the hospital staff was ready to discharge him. The court stated that the defendant had expressed a willingness and an eagerness to talk to the police and did not indicate to medical personnel or anyone else that he wanted to terminate the interviews. Finally, the court noted that the defendant eventually terminated the interviews at the end of the night, at which point the police ceased asking him questions.

The court acknowledged that five different police officers "questioned [the defendant] repeatedly" during the approximately four and one-half hours between 9:40 p.m. and 2:20 a.m. and that multiple other police officers were present both in the defendant's hospital room and at the hospital generally throughout the evening.[16] The court also noted that the police officers interviewed the defendant for a total of approximately one hour between 9:40 p.m. and 2:20 a.m.[17] The court acknowl-

edged that, although some of the officers who interviewed the defendant were wearing plain clothes, multiple officers were in uniform, and multiple officers visibly were armed with service weapons. The court additionally acknowledged that the defendant was "physically confined to the hospital until medical staff deemed that it was medically appropriate for him to be discharged," and that, at the beginning of the evening, a nurse had connected the defendant to an IV. The court noted that the medical staff had obtained the defendant's clothing, which the police seized and took into custody with the defendant's consent.

Further, the court found that the police did not inform the defendant that he was free to leave until 12:09 a.m. The court acknowledged that the police never informed the defendant that he was a suspect or that he could terminate their questioning of him. The court also noted that the defendant was intoxicated, had a tenth grade education and, in the past, may have been taking medication for attention deficit hyperactivity disorder, depression, and anxiety. The court, however, concluded that these circumstances did not render the defendant "especially vulnerable to police intimidation"; *State* v. *Jackson*, 304 Conn. 383, 419, 40 A.3d 290 (2012); or create a situation in which a reasonable person in his position would have believed that the police restraint on his freedom of movement was akin to restraint associated with a formal arrest. Accordingly, the court determined that the defendant had failed to meet his burden of proving that he was in custody for purposes of *Miranda*.[18]

Subsequently, the court, *Seeley, J.*,[19] conducted a bench trial over the course of multiple nonconsecutive days in June and July, 2019. At trial, the defendant claimed, among other things, that he was acting in self-defense when he injured Patten. Following the conclusion of the trial, the court found the defendant guilty of assault in the first degree.[20] In its written decision, dated August 26, 2019, the court concluded that the state had proven each element of the crime of assault in the first degree beyond a reasonable doubt.[21] With respect to the intent element—that is, that the defendant possessed the specific intent to cause serious physical injury to Patten—the court determined that the defendant's statement to the police that he was "a peaceable person until [someone got] in [his] face, then [he would] fuck [that person] up," supported a conclusion that he had intended to cause serious physical injury to Patten. The court also pointed to the circumstances of the stabbing, including that the defendant approached Patten from behind and stabbed him six times, and that the stab wounds, some of which were located near Patten's vital organs, were deep, as evidence from which the court could infer that the defendant intended to cause serious physical injury. With respect to the causation and deadly weapon elements

of § 53a-59 (a) (1)—that is, that the defendant caused serious physical injury to Patten and did so by means of a dangerous instrument—the court determined that the defendant's admission to the police that he had stabbed Patten with a knife indicated that the defendant caused serious physical injury to Patten by means of a dangerous instrument. The court also rejected the defendant's claim of self-defense, finding that the state had disproven beyond a reasonable doubt that the defendant subjectively believed Patten was about to use deadly physical force against him such that the defendant's use of potentially deadly physical force against Patten was justified.

The defendant subsequently was sentenced to ten years of incarceration, execution suspended after seven years, and five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

The defendant claims on appeal that he was entitled to suppression of the statements he made to the police at the hospital because they were the result of custodial interrogation and that he had not been advised of his *Miranda* rights before the police elicited the statements. The defendant specifically contends that the court improperly concluded that he had failed to establish that he was in custody for purposes of *Miranda* when he made the statements to Hicking, Bugbee, Hatheway, and Patrizz. He argues that a reasonable person in his position would have understood that his freedom to terminate the police interviews was restricted to a degree associated with a formal arrest. We agree with the defendant that his statements should have been suppressed.

I

We first address the defendant's contention that he was in custody for purposes of *Miranda*. We begin by setting forth the relevant legal principles. "Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is in custody heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. . . . This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . . [T]he court in *Miranda* was concerned with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures [that] work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 191. Thus, "[i]t is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interroga-

tion of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona,* [supra, 384 U.S. 444]. Two threshold conditions must be satisfied in order to [require] the warnings constitutionally [mandated] by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Internal quotation marks omitted.) *State* v. *Gonzalez,* 302 Conn. 287, 294, 25 A.3d 648 (2011). "[E]ven patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case . . . ." (Internal quotation marks omitted.) *State* v. *Mangual,* supra, 191 n.8.

"By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations. . . . In so doing, they enhance the trustworthiness of any statements that may be elicited during an interrogation. . . . Consequently, police officers are not required to administer *Miranda* warnings to everyone whom they question . . . [but] rather, they must provide such warnings only to persons who are subject to custodial interrogation." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 191–92.

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective[22] circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. . . . Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry . . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (Citations omitted; footnote added; internal quotation marks omitted.) Id., 193.

"Of course, the clearest example of custody for purposes of *Miranda* occurs when a suspect has been formally arrested. As *Miranda* makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested or otherwise deprived of his freedom of action

*in any significant way. . . .* Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes; in other words, the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody. . . . Rather, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest." (Citations omitted; emphasis altered; internal quotation marks omitted.) Id., 194. "The defendant bears the burden of proving custodial interrogation." (Internal quotation marks omitted.) *State* v. *Marsan*, 192 Conn. App. 49, 67, 216 A.3d 818, cert. denied, 333 Conn. 939, 218 A.3d 1049 (2019).

Our Supreme Court in *Mangual* set forth a nonexhaustive list of factors that courts may consider in determining whether a suspect was in custody for purposes of *Miranda*; see *State* v. *Mangual*, supra, 311 Conn. 196–97; and noted that the ultimate determination "must be based on the circumstances of each case," as opposed to a "definitive list of factors . . . ." (Internal quotation marks omitted.) Id., 196. These factors include "(1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id., 197.

Our Supreme Court explained in *Jackson* that, "[w]hen a defendant has been questioned by the police in a hospital, factors that [our Supreme] [C]ourt has considered in determining whether [a] defendant was in custody for *Miranda* purposes include whether the police physically restrained the defendant in any way or ordered the medical attendants to restrain him physically . . . whether the police took advantage of an inherently coercive situation created by any physical restraint that the medical attendants may have [imposed on] him for purposes of his treatment . . . whether the defendant was able to converse with . . . other people, express annoyance or request assistance from them . . . and the duration of the questioning. . . . Other factors that courts have considered [when a defendant has been questioned by the police in a hospital] include whether the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, [or] arranged an extended treatment schedule with the doctors . . . and the time of day, the mood and mode of

the questioning, whether there were indicia of formal arrest, and the defendant's age, intelligence and mental makeup." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 417–18. We emphasize that "no one factor in a custody analysis is outcome determinative." *State* v. *Mangual*, supra, 311 Conn. 208.

Various courts have concluded that suspects, questioned by the police in a hospital or similar settings, such as psychiatric facilities or ambulances, were in custody for purposes of *Miranda* under the particular facts of the cases before them. See, e.g., *People* v. *Mangum*, 48 P.3d 568, 570–72 (Colo. 2002) (defendant was in custody when police handcuffed him—not because he was under arrest but instead "for his own protection"—transported him to hospital, and questioned him for two to three hours while he remained handcuffed); *State* v. *Lowe*, 81 A.3d 360, 366 (Me. 2013) (defendant questioned by state trooper while in hospital after car accident was in custody after pause in questioning during which trooper gained sufficient information to consider defendant suspect in criminal case before resuming questioning); *People* v. *Tanner*, 31 App. Div. 2d 148, 149, 295 N.Y.S.2d 709 (1968) (defendant was in custody when questioned for one hour by police in hospital, where he was connected to IV tube and was unable to move); *Commonwealth* v. *D'Nicuola*, 448 Pa. 54, 55, 57–58, 292 A.2d 333 (1972) (defendant who had been admitted to hospital after apparent suicide attempt was in custody when questioned by police in hospital room); *Commonwealth* v. *Whitehead*, 427 Pa. Super. 362, 366, 368–69, 629 A.2d 142 (1993) (defendant was in custody when police questioned him in hospital while he was on gurney receiving care); *Scales* v. *State*, 64 Wis. 2d 485, 492, 219 N.W.2d 286 (1974) (defendant was in custody when police questioned him in hospital room after arresting him there on charges related to questioning); see also *Reinert* v. *Larkins*, 379 F.3d 76, 80, 87 (3d Cir. 2004) (defendant was in custody when police officer questioned him in ambulance), cert. denied sub nom. *Reinert* v. *Wynder*, 546 U.S. 890, 126 S. Ct. 173, 163 L. Ed. 2d 201 (2005); *United States* v. *Hallford*, 280 F. Supp. 3d 170, 173–77, 179 (D. D.C. 2017) (defendant was in custody when questioned by United States Secret Service agents in physician's lounge room of psychiatric hospital, where defendant involuntarily was committed), aff'd, 756 Fed. Appx. 1 (D.C. Cir. 2018); *People* v. *Turkenich*, 137 App. Div. 2d 363, 365, 367, 529 N.Y.S.2d 385 (1988) (defendant with diminished mental capacity was in custody when questioned by police in psychiatric ward of hospital, where defendant was confined pursuant to involuntary commitment order).

In concluding that these suspects were in custody when they were questioned by the police in a hospital or a similar environment, the courts considered whether the relevant factual circumstances supported

a determination that a reasonable person in the defendant's position would have believed he was in custody for *Miranda* purposes. See, e.g., *United States* v. *Hallford*, supra, 280 F. Supp. 3d 180 ("when determining whether a reasonable person would have felt free to terminate the interrogation and leave, courts must examine all of the circumstances surrounding the interrogation" (internal quotation marks omitted)); *People* v. *Mangum*, supra, 48 P.3d 571 ("[a] court must examine all of the circumstances surrounding the interrogation to determine whether there was a restraint on freedom of movement of the degree associated with a formal arrest"); see also *State* v. *Mangual*, supra, 311 Conn. 196. For example, in *People* v. *Tanner*, supra, 31 App. Div. 2d 149–50, the court determined, based on the factual circumstances surrounding the interrogation, that a defendant was in custody when he was questioned by the police in his hospital room. The court identified the various factual circumstances that informed its conclusion—that the defendant was questioned for one hour by various officers, that multiple police officers were present for the questioning, and that the defendant physically was incapable of moving because he was connected to an IV tube and had suffered a gunshot wound to his leg. See id., 149–50. Thus, despite the defendant's being "immobilized by factors entirely independent of any police activity . . . [the court concluded that] for all practical purposes," the defendant's freedom of movement was restricted; id.; and that the police had interrogated the defendant in a way that "indicate[d] that [the interrogation] was custodial." Id., 150.

With these legal principles in mind, we turn to the merits of the defendant's contention that he was in custody for purposes of *Miranda* when the police questioned him in the hospital. This contention first requires us to ascertain whether a reasonable person in the defendant's position would have believed he was at liberty to terminate the police questioning and that his freedom of movement was restricted by the police.[23] See, e.g., *State* v. *Mangual*, supra, 311 Conn. 193. If we conclude that a reasonable person in the defendant's position would have believed he was at liberty to terminate the police questioning and that his freedom of movement was not restricted by the police, the inquiry is over, and the defendant has failed to meet his burden of establishing that he was in custody for purposes of *Miranda*. See id., 198. If, however, we conclude that a reasonable person in the defendant's position would not have believed he was at liberty to terminate the police questioning and that his freedom of movement *was* restricted by the police, we proceed to the second step of the inquiry to determine whether a reasonable person in the defendant's position would have believed that the police restraint on his freedom of movement was "akin to the restraint associated with a formal

arrest." Id.

Having scrupulously examined the record, we first conclude, in light of the objective circumstances surrounding the police interviews of the defendant, that a reasonable person in the defendant's position would not have believed he was at liberty to terminate the interrogation. Although the police did not physically restrain the defendant or instruct medical personnel to restrain him physically, the police took advantage of the restraint that the medical attendants imposed on the defendant for purposes of his treatment. The defendant initially was attached to an IV line. Rajchel, the attending physician who provided medical care to the defendant, had mandated that the defendant be discharged from the hospital only after he became sober. Accordingly, the medical staff forbade the defendant from leaving the hospital premises until he regained sobriety. This directive was communicated to the defendant by a police officer, Bugbee. See footnote 12 of this opinion.

Significantly, and despite the hospital staff's restraint of the defendant, at no point during the evening did the police inform him that he was free to terminate their interviews at any time. At no point during the evening did the police tell the defendant that he could stop answering their questions if he so chose. Contra *State* v. *Pinder*, 250 Conn. 385, 412, 736 A.2d 857 (1999) (finding of custody less likely in case in which "it was made very clear to [the defendant] that . . . he could stop answering questions anytime he chose on at least three occasions" (internal quotation marks omitted)). "[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. . . . When . . . a detained suspect is not so informed but, instead, is kept in the dark about the purpose and duration of the detention, he is far more likely to view his seizure by the police as the functional equivalent of an arrest." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 204–205. Prior to 12:09 a.m., the police did not inform the defendant that, in the absence of a hospital directive to the contrary, he was free to leave.[24] In other words, the police did not explain to the defendant that they were not holding or detaining him in any way until more than two hours after their first encounter with him—which the police, not the defendant, initiated.

Moreover, the officers in the present case created a "large and intimidating police presence"; id., 208; that "transformed [the hospital] into the type of police dominated atmosphere that could undermine an individual's decision to remain silent." *State* v. *Castillo*, 165 Conn. App. 703, 717, 140 A.3d 301 (2016), aff'd, 329 Conn.

311, 186 A.3d 672 (2018). In addition to the five police officers who questioned the defendant, various other officers remained in the defendant's hospital room during periods of questioning such that the defendant was surrounded by multiple police officers during numerous rounds of questioning. See *State* v. *Mangual*, supra, 311 Conn. 201 (presence of seven officers on premises supported finding of custody). At least one other officer who did not interview the defendant, Pryputniewicz, was present in the defendant's hospital room during questioning. "[T]here is an increased likelihood that a reasonable person in the defendant's position would have been intimidated by the considerable police presence"; id.; in his hospital room because multiple officers were in his room, at the same time, while he was questioned. See id.

Additionally, although the record does not reflect that an officer formally was stationed outside of the defendant's hospital room, multiple officers entered and exited the defendant's room at various points throughout the evening, and Bugbee remained on the premises for a significant portion of the evening. At one point during the evening, the defendant summoned Bugbee, who was outside of his room, indicating that the defendant was aware of at least Bugbee's presence in the vicinity of his hospital room. As our Supreme Court has stated, "the presence of a large number of visibly armed law enforcement officers goes a long way [in rendering a particular location] a police-dominated atmosphere." (Internal quotation marks omitted.) Id. Thus, the police dominated atmosphere that the police created supports a conclusion that a reasonable person in the defendant's position would have believed he was not at liberty to terminate the police questioning.

Further, during the period of approximately four and one-half hours during which the defendant was subjected to the hospital's directive not to leave the premises, five different police officers repeatedly questioned the defendant about his version of events. The police collectively questioned the defendant for approximately one hour. The questioning was not "limited" or "brief" in duration; *State* v. *DesLaurier*, 230 Conn. 572, 581, 646 A.2d 108 (1994); like questioning that lasts a mere few minutes; see id.; or takes place over the course of ten or fifteen consecutive minutes. See *State* v. *Kirby*, 280 Conn. 361, 396, 908 A.2d 506 (2006). Unlike in the Illinois Appellate Court's decision in *People* v. *Vasquez*, 393 Ill. App. 3d 185, 913 N.E.2d 60 (2009), which our Supreme Court cited in *State* v. *Jackson*, supra, 304 Conn. 418, and in which the Illinois Appellate Court determined that police interrogation of a defendant in a hospital for thirty-five minutes during the early afternoon did not support a finding of custody; see *People* v. *Vasquez*, supra, 187–90; the collective one hour of questioning in the present case took place over the course of a "prolonged" period; *State* v. *Jackson*, supra,

418; of more than four hours during the late evening into the early morning hours.

Additionally, the questioning took place in a hospital room, as opposed to surroundings that were "familiar" to or comfortable for the defendant, like those present in *State* v. *Spence*, 165 Conn. App. 110, 118, 138 A.3d 1048, cert. denied, 321 Conn. 927, 138 A.3d 287 (2016), in which this court determined that a finding of custody was not supported when a defendant's "surroundings were familiar . . . [because] the defendant . . . was in an open area of [his] home, and he was surrounded by his family including other adults." Id.; see also *State* v. *Mangual*, supra, 311 Conn. 206 ("an encounter with police is generally less likely to be custodial when it occurs in a suspect's home"). Although the hospital was "public" in that nonpolice personnel had access to the defendant's hospital room, the record shows that the defendant was not "familiar" with the hospital to the same degree that, for example, a person would be with his home, and that the defendant was surrounded by the police, hospital security, and the medical staff, as opposed to friends and family, in the hospital room. We note, however, that "the setting of [an] interrogation is not so important to the inquiry as the question of police domination of that setting . . . ." (Internal quotation marks omitted.) Id. As we have noted, the police presence—particularly in the defendant's hospital room—dominated the defendant's immediate atmosphere.

Although the police did not prevent the defendant from speaking with or requesting assistance from the medical staff, which had access to his hospital room and spoke with him at various points during the evening, as we previously have explained, "no one factor . . . is outcome determinative." Id., 208. Simply because the defendant theoretically[25] had the ability to converse with, express annoyance to, or request assistance from the medical professionals who provided him medical care to terminate the interviews does not mean, by itself, that a reasonable person in the defendant's position would believe that he was at liberty to terminate the interrogation, particularly in light of the police dominated presence that permeated his immediate surroundings. We also note that the defendant was alert enough to be able to converse with the police and the medical staff but that he had a tenth grade education and was intoxicated during his interviews with the police,[26] which may have further undermined his will to resist the pressures inherent in the police dominated environment that surrounded him.

Accordingly, we are unpersuaded that the factors that militate against a finding that the defendant was in custody outweigh the coercive features of the defendant's detention. See id., 206. We conclude that a reasonable person in the defendant's position would not have

believed he was at liberty to terminate the police questioning and would have concluded that his freedom of movement was restricted by the police. Thus, we proceed to the second step of the inquiry—that is, we must determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (Internal quotation marks omitted.) Id., 193. Our review of the factual circumstances of the present case leads us to answer this question affirmatively.

Although the defendant was not handcuffed; see id., 208 ("[h]andcuffs are generally recognized as a hallmark of a formal arrest" (internal quotation marks omitted)); or formally booked, he was physically connected to an IV line while at least one police officer questioned him, and he constantly was surrounded by numerous police officers and, during at least one interview, hospital security was inside his hospital room. As we have explained, several of the police officers who questioned the defendant or remained in his room while he was being questioned were in uniform, had visible service weapons on their persons, or both.

When the defendant was questioned, although the record does not reflect that the police utilized an "aggressive"; *State* v. *Jackson*, supra, 304 Conn. 418; or "threaten[ing]" tone; *State* v. *Mangual*, supra, 311 Conn. 208; the presence of multiple armed, uniformed officers for multiple hours and throughout multiple rounds of police questioning produced a "large and intimidating police presence"; id.; "that could undermine an individual's decision to remain silent." *State* v. *Castillo*, supra, 165 Conn. App. 717. This police presence lasted throughout the duration of the defendant's time at the hospital because police officers repeatedly entered and exited the defendant's hospital room and, at least one officer, the presence of whom the defendant was aware, remained on the premises and in the defendant's vicinity throughout the duration of the evening.

Further, as we have stated, although the police did not advise the defendant that he was under arrest, they did not advise the defendant that they were not holding or detaining him until after multiple rounds of questioning, and they never advised him that he was free to terminate their interviews at any time or to stop answering their questions if he so chose. See footnote 24 of this opinion. The police presence was itself threatening and intimidating, and the officers' conduct "conveyed a clear message of complete, unfettered and temporally indefinite police control." *State* v. *Mangual*, supra, 311 Conn. 208. Thus, we conclude that a person in the defendant's position "reasonably would have believed that [he] was in police custody to the degree associated with a formal arrest"; id., 195–96; because, as we have set forth herein, " 'the relevant environment' "; id., 193; including the "large and intimidating

police presence"; id., 208; which transformed the hospital into a police dominated atmosphere, the restraint that the medical attendants imposed on the defendant for purposes of his treatment and of which the police took advantage, the extensive duration of questioning to which multiple police officers subjected the defendant, and the failure of the police to advise the defendant that he was free to terminate the interviews "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (Internal quotation marks omitted.) Id., 193.

We note that the present case is distinguishable from cases in which our Supreme Court has determined that a defendant, questioned by the police in a hospital, was not in custody for *Miranda* purposes. In *State* v. *DesLaurier*, supra, 230 Conn. 576, for example, our Supreme Court determined that a defendant, questioned by the police in a hospital, was not in custody for *Miranda* purposes under the factual circumstances of the case. The defendant in *DesLaurier* was convicted of assault in the second degree with a motor vehicle and operating a motor vehicle while under the influence of intoxicating liquor, arising out of an incident during which he lost control of and crashed the vehicle after having left a pool hall where he steadily consumed alcohol during the several hours he was there. Id., 573. An emergency response team found the defendant intertwined with the body of his stepbrother, who was in the front passenger seat; however, initially, it was unclear which individual had operated the vehicle. Id., 574. The defendant acted aggressively and combatively, arguing with medical personnel as they attempted to provide care, rejecting medical care and attempting to remove the brace and restraining belt attached to a body board that had been used to extract him from the vehicle. Id., 574–75.

A state police trooper who responded to the scene initially avoided interfering with the medical attendants' treatment of the defendant, but medical personnel eventually requested the trooper's assistance to attempt to calm the defendant. Id., 575. The trooper instructed the defendant to lie down and to allow medical personnel to do their job, and he stayed close by as they placed the defendant into an ambulance. Id. The trooper followed the ambulance as it transported the defendant and his stepbrother to a hospital. Id.

After the trooper arrived at the hospital, he proceeded to an emergency room in which the defendant was located, which was connected to a separate room in which the stepbrother was receiving care. Id. The defendant continued to refuse medical care, despite being injured, and the hospital staff informed the trooper that the defendant "probably [was] going to take off." (Internal quotation marks omitted.) Id. The trooper thus entered the defendant's room, introduced himself to

the defendant, and asked whether the defendant had been driving the vehicle. Id. The defendant answered, " '[n]o.' " Id. The trooper asked the stepbrother the same question, and the stepbrother replied that the defendant had been driving. Id. The trooper then relayed to the defendant what his stepbrother had said, and the defendant stated, "[a]ll right, I was . . . driving." (Internal quotation marks omitted.) Id. Immediately thereafter, the trooper placed the defendant under arrest and read him his *Miranda* rights. Id. At trial, the defendant's statement that he had been driving was admitted into evidence, over the defendant's objection. Id., 576.

On appeal, our Supreme Court concluded that the trial court properly had admitted the defendant's statement to the trooper because the defendant was not in custody for purposes of *Miranda*. Id. In so concluding, our Supreme Court noted that the trooper was the sole law enforcement officer present in the defendant's hospital room. See id., 581. Accordingly, unlike in the present case, in which multiple officers entered and exited the defendant's hospital room throughout the evening and stayed in the room during periods of questioning, the presence of a single trooper in *DesLaurier* did not create a "police-dominated atmosphere . . . ." (Internal quotation marks omitted.) Id., 579. Our Supreme Court relied on the fact that the trooper briefly questioned the defendant for a period of only several minutes in a public hospital emergency room in the presence of witnesses who were not police officers—specifically, hospital medical staff. See id., 581. Our Supreme Court stated that there was "no evidence indicating that the defendant was unable to converse with these other people, express annoyance or request assistance from them." Id. The trooper also did not restrain the defendant when he questioned him. Id., 580–81.

Significantly, our Supreme Court concluded that the duration of the trooper's questioning of the defendant was "momentary" and "temporary . . . ." Id., 581. Our Supreme Court cited two federal circuit court cases; see *Allen* v. *United States*, 390 F.2d 476, 479 (D.C. Cir. 1968); *United States* v. *Kennedy*, 573 F.2d 657, 660 (9th Cir. 1978); to distinguish "limited and brief inquir[ies]," which supported a conclusion that a suspect was not in custody, from longer periods of questioning, including a period of questioning of forty-five minutes, which supported a conclusion that a suspect was in custody. See *State* v. *DesLaurier*, supra, 230 Conn. 581. The Supreme Court likened the short, brief questioning that took place in *DesLaurier* to those "limited and brief inquir[ies]" that supported a conclusion that a suspect was not in custody for *Miranda* purposes. Id. The brief duration of the trooper's questioning of the defendant in *DesLaurier* certainly is distinguishable from the duration of the questioning that took place in the present case, which, as we have explained, occurred over the course of more than four hours and collectively

lasted approximately one hour.

Likewise, in *State* v. *Jackson,* supra, 304 Conn. 419, our Supreme Court determined that a defendant, questioned by the police in a hospital, was not in custody for *Miranda* purposes under the factual circumstances of the case. The defendant was convicted of murder after he had killed his former paramour in her apartment in New Haven. Id., 387–88. On the day after the defendant committed the murder, he attempted to end his life by jumping out of a New York City hotel window, and, although he survived, he sustained several injuries. Id., 388. Consequently, the defendant was transported to a hospital, accompanied by police officers, for medical treatment and eventually was admitted into a surgical care unit. Id., 388, 414.

When New Haven police officers arrived at the hospital to interview the defendant approximately one day after he had jumped out of the window, an out-of-state police officer was present in the defendant's hospital room because the defendant had attempted to commit suicide. Id., 414. Before entering the defendant's hospital room, a New Haven police detective spoke to a nurse, who told the detective that the defendant was awake and able to talk. Id. The detective then instructed the out-of-state police officer to exit the hospital room and asked the defendant if he knew why he was in the hospital and for his name. Id. The defendant stated that he wanted to die and provided a fake name to the detective. Id. The detective initially did not inform the defendant that he was under arrest. Id. Eventually, after approximately thirty minutes, the defendant admitted his true identity, and the detective subsequently read the defendant his *Miranda* rights. Id., 414–15. The detective then informed the defendant that he was not under arrest and asked him questions, to which the defendant provided answers. Id., 415.

Prior to trial, the defendant moved to suppress the statements that he had provided to the detective in the hospital. Id. The trial court denied the defendant's motion, determining that the only statement the defendant had provided to the police before waiving his *Miranda* rights was his name and that the defendant was not subjected to custodial interrogation at that time. Id., 415–16, 419. Consequently, at trial, the detective testified as to the content of his interview of the defendant. Id., 415.

Our Supreme Court concluded that the trial court properly had admitted the defendant's statement to the trooper because the defendant was not in custody for purposes of *Miranda* when he provided the initial statement to the trooper. See id., 419. Our Supreme Court relied on the fact that only one police detective questioned the defendant. See id., 414. Although an out-of-state police officer had accompanied the defendant to the hospital and remained in the hospital room until

the detective began to question the defendant, the out-of-state officer had done so to monitor the defendant in light of his suicide attempt. Id., 418. The detective specifically instructed the out-of-state officer to exit the hospital room before he began to question the defendant. Id., 414. The Supreme Court stated: "[T]here was no reason for the defendant to feel intimidated by the presence of the police inside the hospital room before [the detective] arrived and outside the room thereafter." Id., 419. Accordingly, unlike the situation in the present case, the limited police presence in *Jackson* did not transform the defendant's hospital room into the sort of police dominated atmosphere "that could undermine an individual's decision to remain silent." *State* v. *Castillo*, supra, 165 Conn. App. 717.

Further, our Supreme Court noted that the questioning was "neither prolonged nor aggressive . . . ." *State* v. *Jackson*, supra, 304 Conn. 418. Unlike the situation in the present case, approximately thirty consecutive minutes passed between the time when the detective in *Jackson* asked the defendant what his name was and when the defendant provided his true identity to the detective, at which point the detective advised the defendant of his *Miranda* rights. Id., 414–15. The detective neither subjected the defendant to multiple rounds of questioning nor questioned the defendant over an extensive period of time, and the detective eventually advised the defendant of his *Miranda* rights. See id.

Additionally, our Supreme Court noted that the officer in *Jackson* eventually informed the defendant that he was not under arrest. See id., 415. The Supreme Court also noted that the defendant was immobilized for medical treatment and that the police did not physically restrain him, ask hospital personnel to extend his medical treatment, or prohibit him from leaving the hospital room or asking hospital personnel to assist him in terminating the questioning. See id., 418. Finally, the Supreme Court determined that "there [wa]s no evidence that [the defendant's] age or intelligence rendered him especially vulnerable to police intimidation and, although he may have been despondent and was receiving pain medication for his injuries, the nurse indicated that he was capable of speaking with the police, and [the detective] testified that he was alert and coherent." Id., 419.

Thus, the case before us is distinguishable from *DesLaurier* and *Jackson*. The facts of the present case lead us to conclude that a reasonable person in the defendant's position would have believed that he was not at liberty to terminate the police questioning, that his freedom of movement was restricted by the police; see *State* v. *Mangual*, supra, 311 Conn. 193; and "that [he] was in police custody to the degree associated with a formal arrest . . . ." Id., 195–96. "[T]he relevant environment present[ed] the same inherently coercive

pressures" that would be present, had the police questioned the defendant at a police station. (Internal quotation marks omitted.) Id., 193. Accordingly, we conclude, contrary to the trial court's determination, that the defendant was in custody for purposes of *Miranda*.

## II

Having determined that the defendant was in custody for purposes of *Miranda*, we next consider whether the police questioning of the defendant constituted interrogation. We conclude that the police officers' questioning of the defendant constituted interrogation for purposes of *Miranda* because the police officers should have known that their questions reasonably were likely to elicit incriminating statements from the defendant. See *State* v. *Ramos*, 317 Conn. 19, 29, 114 A.3d 1202 (2015).

We begin by setting forth the applicable standard of review and governing legal principles. Whereas "[a] finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . [t]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) Id., 30. We note that, during the hearing on the defendant's motion to suppress, the state presented evidence on the issue of whether the police interrogated the defendant for purposes of *Miranda* and, on appeal, the state does not raise this issue as an alternative ground for affirmance. Accordingly, although the court did not reach this issue because it concluded that the defendant was not in custody for *Miranda* purposes, we nonetheless determine this mixed question of law and fact because the court made sufficient findings of fact on which we may consider and resolve the issue. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 349 n.28, 984 A.2d 684 (2009) (reviewing alternative ground for affirmance that court below did not address because alternative ground raised question of law, over which Supreme Court's review is plenary, and essential facts pertaining to issue were undisputed); *Bouchard* v. *Deep River*, 155 Conn. App. 490, 496, 110 A.3d 484 (2015) (same).

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the

police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 317 Conn. 29. "[T]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. . . . The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is highly relevant." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Smith*, 321 Conn. 278, 288, 138 A.3d 223 (2016).

We begin by examining the factual circumstances of the police conduct surrounding the defendant's statements. Each of the four police officers to whom the defendant provided the statements he later sought to suppress—Hicking, Bugbee, Hatheway, and Patrizz—asked the defendant to explain what had happened or to recount his version of events with respect to the altercation. Hicking specifically asked the defendant clarifying questions as the defendant recounted his version of the events leading up to the altercation and the altercation itself. Bugbee asked the defendant to tell him what happened and informed him that he would transcribe the defendant's version of events in the written statement he prepared. Hatheway, likewise, interviewed the defendant concerning the defendant's version of events. Finally, Patrizz, the lead detective assigned to the case, asked the defendant to provide his version of events. As the court stated in its memorandum of decision, "[a]s the lead detective, [Patrizz] wanted to introduce himself to the defendant *and ask him about his version of events* . . . [and, in the defendant's hospital room] asked the defendant to once again provide his version of events." (Emphasis added.) The defendant eventually terminated the interview with Patrizz because he was "annoy[ed]" that he had to repeat his version of events multiple times.

As our Supreme Court explained in *State* v. *Gonzalez*, supra, 302 Conn. 298, when a police officer asks a defendant to provide his "side of the story" as to an altercation or a crime, the question is reasonably likely to elicit an incriminating response from the defendant. See id.; see also *State* v. *Hoeplinger*, 206 Conn. 278, 287 n.6, 537 A.2d 1010 (1988) (determining that, in case in which police officer asked defendant to "give [the officer] a statement concerning what happened," there was "no question that the defendant was subject to interrogation" for purposes of *Miranda*). Unlike asking a defendant routine booking questions unrelated to the crime; see, e.g., *State* v. *Evans*, 203 Conn. 212, 225–27, 523

A.2d 1306 (1987); or asking a defendant whether he understands his rights; see, e.g., *State* v. *Kirby*, supra, 280 Conn. 399–400; by asking a defendant to provide his version of the story, a police officer "implie[s] that the defendant was involved in the [subject crime] and explicitly [seeks] statements from the defendant regarding his involvement in" that crime. *State* v. *Gonzalez*, supra, 298. "[P]olice [officers] should know that such words are reasonably likely to elicit incriminating statements." Id.

In the present case, the police officers repeatedly asked the defendant to provide his version of events with respect to his altercation with Patten. These questions were not "objectively neutral question[s] unrelated to the crime" for which the defendant was later prosecuted. Id. To the contrary, the questions "implied that the defendant was involved" in the altercation; id.; and explicitly called for responses from the defendant regarding his involvement in the altercation, for which he was later charged with assault in the first degree. The officers "should have known [that their questions] were reasonably likely to elicit an incriminating response" from the defendant. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Smith*, supra, 321 Conn. 288.

At the suppression hearing, Bugbee testified that he did not advise the defendant of his *Miranda* rights prior to taking the defendant's statement because, in Bugbee's mind, the defendant "wasn't . . . a suspect." Although "the subjective intent of [a] police officer [may be] relevant" to our consideration of whether a defendant was interrogated for purposes of *Miranda*, it is "not conclusive." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 302 Conn. 299. Bugbee's subjective understanding of whether the defendant was a suspect does not overcome the strong, highly relevant "relationship [between] the questions asked" by all of the officers, including Bugbee, and "the crime committed . . . ." (Internal quotation marks omitted.) Id., 298. Therefore, we conclude that the officers' questions constituted "the functional equivalent of interrogation because the police should have known" that asking the defendant to provide his side of the story was "reasonably likely to invite the defendant to respond by making possibly incriminating statements." Id., 299. In light of our determination that the police subjected the defendant to custodial interrogation, we conclude that the police were required to advise the defendant of his *Miranda* rights before eliciting statements from him. See id., 294.

### III

Our inquiry, however, does not end simply because we have determined that the police were required to advise the defendant of his *Miranda* rights prior to subjecting him to custodial interrogation and eliciting

statements from him. We additionally must address the state's contention that the admission of the defendant's statements into evidence at trial nonetheless was harmless beyond a reasonable doubt. The state specifically contends that the statements the defendant made to the police in response to police questioning did not constitute "confessions" and that many of the defendant's statements supported his self-defense theory at trial. The state also argues that the statements constituted only a "minimal part" of the state's proof, noting that it did not present the defendant's statements during its case-in-chief and that it merely offered the statements to show that parts of the statements were inconsistent with one another or with the defendant's in-court testimony. Finally, the state contends that the strength of its case against the defendant, outside of the statements, was overwhelming. Because we conclude that the defendant's statements may have had a tendency to influence the court's analyses of both the charged offense of assault in the first degree and the defendant's claim of self-defense, we reject the state's contention that the admission of the statements into evidence at trial was harmless beyond a reasonable doubt.

"If statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010). "When an [evidentiary] impropriety is of constitutional [dimension], the state bears the burden of proving that the error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 214.

We emphasize that the state's burden is a "demanding" one. Id., 212. "Whether the error was harmless depends on a number of factors, such as the importance of the evidence to the state's case, whether the evidence was cumulative of properly admitted evidence, the presence or absence of corroborating evidence, and, of course, the overall strength of the state's case." *State* v. *Culbreath*, 340 Conn. 167, 192, 263 A.3d 350 (2021). "Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 806, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). "If the evidence may have had a tendency to influence the judgment of the [trier of fact], it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the

strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 214–15.

As our Supreme Court recently stated in *State* v. *Alexander*, 343 Conn. 495, 275 A.3d 199 (2022), in a case that "was tried to a court, not a jury . . . our harmless error analysis is facilitated substantially by the express findings contained in the memorandum of decision by which the [court] returned [its] ultimate finding of guilt." Id., 506. In *Alexander*, our Supreme Court considered whether a defendant was harmed when his statements to the police, which should have been suppressed, improperly were admitted into evidence during his criminal trial. Id., 502. Our Supreme Court concluded that "the error was harmless beyond a reasonable doubt"; id., 506; because "the defendant's . . . statement[s] did not implicate [him] in the [charged offenses at issue], [were] not important to the state's case, and did not in any respect affect the convictions at issue." Id., 507.

Our Supreme Court noted that the trial court expressly had stated in its memorandum of decision that it "did not consider" the defendant's statements in determining his guilt as to the charged offenses at issue. (Internal quotation marks omitted.) Id., 503. Specifically, our Supreme Court stated, the trial court neither "credited [n]or relied on the defendant's . . . statement[s] to reach [its] respective findings of guilt." Id., 507. "[I]t did not consider any of the statements made by the defendant during his interview with the police . . . in determining the defendant's guilt" as to his conviction on the charge of felony murder. (Internal quotation marks omitted.) Id., 503. Our Supreme Court further stated that the trial court's "insistent remarks that the defendant's statements had no effect on [its] [decision] reinforce[d] our [Supreme Court's] confidence in [its] . . . conclusion that the improper admission of the defendant's . . . statement[s] had no impact on the guilty findings at issue." (Internal quotation marks omitted.) Id., 510.

Our Supreme Court in *Alexander* further noted that "[t]he accuracy of the [trial court's] assessment of the impact that the improperly admitted evidence had on [the] guilty verdict [was] underscored by the [court's] determination that" a separate offense for which the defendant was convicted—carrying a pistol without a permit—"necessitat[ed] a different result." (Internal quotation marks omitted.) Id., 510 n.12. Our Supreme Court explained, "[i]n contrast to the defendant's conviction on the . . . charges [at issue on appeal], [the trial court] *did* explicitly rely on the defendant's statements"; (emphasis added) id., 510–11 n.12.; which the trial court had described as "inculpatory [as to the charge of carrying a pistol without a permit] and tantamount to a confession"; (internal quotation marks omit-

ted) id., 504; in determining that the defendant was guilty of carrying a pistol without a permit. Id.

In the present case, and in the court's memorandum of decision, the court explicitly relied on at least one of the defendant's statements that we have concluded should have been suppressed—namely, the defendant's statement, "I'm a peaceable person until you get in my face, then I fuck you up"—in finding the defendant guilty of assault in the first degree. To meet its burden as to the offense of assault in the first degree, it was necessary for the state to prove beyond a reasonable doubt, inter alia, that the defendant possessed the specific intent to cause serious physical injury to Patten. See General Statutes § 53a-59 (a) (1). As the court recognized, "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 756–57, 250 A.3d 648 (2020).

In its evaluation of the intent element, the court noted that Patten had punched the defendant in the face during the first altercation, "*which angered the defendant*," and, after Patten and the defendant initially had separated from one another, the defendant "sat down by the fire, *but he was angry.*" (Emphasis added.) The defendant's anger, the court concluded, motivated him to attack Patten from behind with the intent to cause serious physical injury to him. In support of its determination that the defendant possessed the requisite intent to commit assault in the first degree, the court specifically cited one of the statements that the defendant made to Bugbee: "I'm a peaceable person until you get in my face, then I fuck you up." As in *Alexander*, in which the trial court expressly relied on the statement of the defendant that he temporarily had possessed a handgun as evidence in support of its determination that he was guilty of carrying a pistol without a permit; see *State* v. *Alexander*, supra, 343 Conn. 510–11 n.12; the court in the present case expressly relied on the statement of the defendant that he was a "peaceable person until [someone] g[ot] in [his] face, then [he would] fuck [him] up" as evidence in support of its determination that the state had proven beyond a reasonable doubt the element of intent, a requisite element of the charge of assault in the first degree.

We also note, contrary to the state's position on appeal, that *many* of the defendant's statements were, indeed, inculpatory, and many of his statements specifi-

cally may have had a tendency to influence the court's analysis of the element of intent. As our Supreme Court noted in *State* v. *Mitchell*, supra, 296 Conn. 461, a "noteworthy fact" in a court's analysis of whether the improper admission at trial of statements that were taken in violation of *Miranda* nonetheless was harmless error is whether the statements themselves were inculpatory. In the present case, the defendant's statements—including, "I'm a peaceable person until you get in my face, then I fuck you up," "I take shit from no one," "I'm a peaceable man, but you drive me to the edge, I'm not going to let up," and, "I don't flight, I fight"—incriminated him with regard to the offense of assault because the statements, both individually and collectively, specifically tended to demonstrate the defendant's intent to cause serious physical injury to Patten, who had punched him in the face shortly before he stabbed Patten.[27] Thus, we cannot say that these statements were "relatively benign [or] facially innocuous . . . ." (Internal quotation marks omitted.) *State* v. *Mitchell*, supra, 462.

Finally, we note that, at trial, the state extensively cross-examined the defendant as to several of the statements he made to the police and, during its rebuttal argument at the conclusion of the trial, recited his various inculpatory statements. Specifically, the prosecutor stated: "I think [the defendant] said it better than I ever could. 'I take shit from no one, you swing at me I'm going to end you.' 'He's lucky he's family because honestly I could have ended him but I didn't, instead of fight or flight you know how it goes, I don't fly, I fight.' 'I'm a peaceable person until you get in my face, then I'll fuck you up.' 'Honestly, I take shit from no one.' 'I'm a peaceable man, but you drive me to the edge, I'm not going to let up.' "

Thus, we conclude that the defendant's multiple inculpatory statements "may have had a tendency to influence the judgment of the [trier of fact]"; (internal quotation marks omitted) *State* v. *Mangual*, supra, 311 Conn. 214; with respect to the element of intent. It is axiomatic, therefore, that the entry of the defendant's statements into evidence at trial was not harmless beyond a reasonable doubt. See id.

Moreover, many of the defendant's statements may have had a tendency to influence the court's analysis of his self-defense claim. As we have stated, the defendant pursued at trial a claim of self-defense—that is, that he had used reasonable physical force against Patten to defend himself from what he reasonably believed to be Patten's use or imminent use of physical force against him and that he was not the initial aggressor. See General Statutes § 53a-19.[28] The defendant specifically contended that Patten initially shoved the defendant, began to punch him, knocked him onto the ground, and choked him while repeatedly punching him. The defen-

dant maintained that he was unable to breathe and momentarily had lost consciousness while Patten held him in a headlock, and that the defendant stabbed Patten as a necessary means to remove himself from Patten's chokehold.

"Under our Penal Code, self-defense . . . is a [claim of] *defense*, rather than an *affirmative defense.* . . . Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised [claim of] *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. . . . Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Grasso*, 189 Conn. App. 186, 198, 207 A.3d 33, cert. denied, 331 Conn. 928, 207 A.3d 519 (2019). Because the court concluded that "the evidence presented at trial raised a genuine issue as to the possible availability of the [claim] of self-defense with respect to the charge of assault in the first degree," the state was required to disprove the defendant's claim of self-defense beyond a reasonable doubt. See *State* v. *Grasso*, supra, 198.

The court ultimately concluded that the state had disproven the defendant's claim of self-defense beyond a reasonable doubt. In assessing whether the state had met its burden, the court was required to consider, inter alia, whether the state had disproven beyond a reasonable doubt that the defendant was not the initial aggressor; see General Statutes § 53a-19 (c) (2); that the defendant had the duty to retreat; see General Statutes § 53a-19 (b) (1); that the amount of force the defendant used, in response to the force he argued that Patten used against him, was proportional; see General Statutes § 53a-19 (a); or that the defendant used force to defend himself from what he believed was the use or imminent use of force against him. See General Statutes § 53a-19 (a).

The defendant's statements incriminated him with regard to various elements of his claim of self-defense. For example, the fact that the defendant stated, "I'm a peaceable person until you get in my face, then I fuck you up," "I take shit from no one," and, "I don't flight, I fight," tended to demonstrate that the defendant did not use force against Patten to defend himself but, instead, used force against Patten to cause serious physical injury to Patten. Likewise, these statements tended to show that the defendant was the initial aggressor—that is, that he used physical force against Patten before Patten used physical force against him—because he

was angry at Patten.

Further, the fact that the defendant stated, "I don't flight, I fight," tended to demonstrate that he ignored any duty to retreat he may have had. The fact that the defendant stated, "I'm a peaceable person until you get in my face, then I fuck you up," made more likely that the amount of force that the defendant used against Patten was excessive. Accordingly, we conclude that the defendant's statements "may have had a tendency to influence the judgment of the [trier of fact]" with respect to various elements of the defendant's claim of self-defense. (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 214.

In light of the foregoing, we agree with the defendant that the state has not met the requisite "demanding standard"; id., 212; to prove that the improper admission of the defendant's statements into evidence at trial was harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] In his principal appellate brief, the defendant additionally claims that the court improperly denied his motion to suppress the statements because the police officers who interviewed him did not electronically record the entire interrogation, as he asserts is required by General Statutes § 54-1o. The defendant withdrew this claim in his reply brief. Accordingly, we do not address it.

The defendant also claims on appeal that the court improperly denied his motion seeking dismissal of the case against him or other forms of relief because the prosecution had failed to timely disclose certain material evidence to the defense. Specifically, the defendant contends that the state failed to timely disclose impeachment material concerning the victim's probationary conditions. See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Because we conclude that the judgment of conviction must be reversed on other grounds and the matter remanded for a new trial, it is unnecessary to reach this claim. We recognize that our Supreme Court has held that, "[u]nder *Oregon* v. *Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982), and its progeny, the double jeopardy clause will bar the retrial . . . of a . . . defendant whose conviction [in the first trial] . . . was secured by prosecutorial misconduct . . . if the prosecutor in the first trial engaged in misconduct with the intent to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Colton*, 234 Conn. 683, 687–96, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). Our careful reading of the defendant's appellate briefs, however, reveals that he does not argue to this court that, in the event that he prevailed on appeal on his *Brady* claim, he is entitled to a judgment of acquittal. See id.; see also *Oregon* v. *Kennedy*, supra, 667.

[2] Our Supreme Court in *Edmonds* specifically noted that "some ambiguity" existed; *State* v. *Edmonds*, supra, 323 Conn. 44; with respect to the factual circumstances surrounding the police search of a defendant in a parking lot and their seizure of narcotics from the defendant's person. See id., 39–44. Our Supreme Court stated, "[t]he precise sequence of events from the time the [police] officers entered the [parking] lot until they frisked the defendant [was] less clear. . . . The officers' testimony at the . . . hearing [on the defendant's motion to suppress], together with the trial court's subsequent factual findings, injected some ambiguity into [multiple parts] of the" sequence of events that the police officers had written in a police report; id., 43–45; including (1) whether a police sergeant who responded to the scene did so "precisely at the same time as" the arresting officers; id., 44; and (2) when the defendant was stopped by the police. See id., 44–45.

The Supreme Court stated that, although the trial court had found that the officers and the sergeant had "entered the parking lot *at the same time*"; (emphasis in original; internal quotation marks omitted) id., 45; "the police report [and the officers' testimony] . . . indicated that [the officers] entered the lot . . . shortly *before* [the sergeant] . . . and the record contain[ed] no evidence to the contrary . . . ." (Emphasis in original.) Id. Thus, our Supreme Court concluded, "*we must understand the [trial] court's finding* that the two [police] cruisers entered at the same time to mean that the two cruisers arrived at the lot at *approximately* the same time . . . ." (Emphasis altered.) Id. Further, to ascertain when the defendant was stopped by the police, our Supreme Court likewise reviewed the undisputed testimony of the officers, which it determined was "consistent with the police report"; id.; because "the trial court [had] made no findings" as to the issue. Id., 46. Accordingly, our Supreme Court referenced the officers' testimony, consistent with the police report, with respect to when the defendant was stopped by the police. See id., 45–46, 59.

[3] Later in the evening, after Patten and the defendant arrived at Rockville General Hospital in Vernon for treatment of injuries, medical staff determined that Patten had a blood alcohol content level of 0.31 and that the defendant had a blood alcohol content level of 0.217.

[4] The defendant stabbed Patten three times in the back, twice in the arm, and once in the front shoulder.

[5] The police later recovered the knife. Subsequent forensic testing established that Patten's blood was on the knife.

[6] Roberge wore a body camera on his person, which he activated when he interacted with the defendant. The full audio and video recordings of the interactions between the defendant and Roberge were admitted into evidence during the suppression hearing and during the subsequent criminal trial.

[7] Roberge additionally reentered the defendant's hospital room at approximately 10 p.m. and exited one minute later. He neither advised the defendant of his *Miranda* rights nor informed the defendant that he was free to leave during this second interaction.

[8] A portion of Hicking's conversation with the defendant was recorded by Bugbee's body camera. The audio and video recording was admitted into evidence during the suppression hearing and at the subsequent criminal trial.

[9] Bugbee was wearing a body camera, which he activated before he spoke with the defendant. The full audio and video recordings of each of Bugbee's and the defendant's conversations from Bugbee's body camera were admitted into evidence during the suppression hearing, and portions of the recordings were admitted into evidence at the subsequent criminal trial.

[10] In its memorandum of decision on the defendant's motion to suppress, the court found the following: At no point during the defendant's stay at the hospital was he ever physically *restrained* or tied to medical equipment restricting his freedom of movement, *except for an IV at the beginning of his treatment*"; (emphasis added); "[h]e was *not restrained in any way*"; (emphasis added); "[the defendant] was not physically *restrained in any way*, by medical staff or [the] police"; (emphasis added); and, "[u]nlike the defendant [in] *Mincey* [v. *Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)], [the defendant in the present case] was not tied to any *tubes*, *needles* or breathing apparatus." (Emphasis added.)

These findings raise two concerns. First, despite the court's finding that, "[u]nlike the defendant [in] *Mincey*, [the defendant in the present case] was not tied to any *tubes*, *needles* or breathing apparatus[es]"; (emphasis added)"; the court simultaneously found that the defendant was attached to an IV line "at the beginning of his treatment." Second,, the court did not clarify what it meant by its use of the ambiguous term "restrained" in this context. We address each concern in turn.

With respect to the court's contradictory findings, a brief review of the United States Supreme Court's decision in *Mincey* is necessary. In *Mincey*, the United States Supreme Court concluded that a defendant's statements, which he made to the police from his hospital bed, were involuntarily made. See *Mincey* v. *Arizona*, supra, 437 U.S. 398–401. The defendant in *Mincey* was encumbered by "tubes, needles, and [a] breathing apparatus"; id., 399; when he was questioned, including "[t]ubes [that had been] inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; [as well as] a catheter [that had been] inserted into his bladder. [The defendant also] received various drugs, and a device was attached to his arm so that he could be fed intravenously." Id., 396.

In the present case, to reconcile the court's seemingly contradictory state-

ments, we read the court's statement, "[u]nlike the defendant [in] *Mincey*, [the defendant in the present case] was not tied to any tubes, needles or breathing apparatus," to mean that the court found that the defendant was not encumbered by the type of tubes, needles, and breathing apparatus that encumbered the defendant in *Mincey* or to the extent that the defendant in *Mincey* was so encumbered. Nonetheless, as the court also found in the present case, and it is undisputed, the defendant *was* attached to an IV line "at the beginning of his treatment."

With respect to our second concern—the court's use of the term "restrained"—we are unsure, simply by reading the court's memorandum of decision, what meaning the court intended to accord to the term "restrained" in this context. The court could have meant "*police* restraint," such as restraint by handcuffs. The court, however, equally could have meant "*hospital* restraint." We likewise are unsure whether the court, by finding that the defendant was not "restrained," determined that the defendant was not tethered to an IV line at any point when he was questioned by the police. Significantly, the court did not make any explicit factual findings concerning the time or times at which the IV line was inserted, exactly how long the IV line remained inserted, or the time at which the IV line was removed from the defendant. Thus, we " 'scrupulous[ly] examin[e]' "; *State* v. *Edmonds*, supra, 323 Conn. 39; the undisputed evidence in the record and the factual findings of the court to resolve whether the defendant was tethered to an IV line when he was questioned by the police. See id., 39, 44–46 (reviewing court's factual findings, as well as undisputed testimony and evidence in record, to resolve factual ambiguities in court's decision).

We have reviewed the defendant's medical records, which were admitted into evidence during the hearing on the defendant's motion to suppress and at trial. The medical records include the following notes from the night in question: (1) as entered into the medical record at 9:50 p.m. by physician's assistant Brian Karwaski, "[s]tart IV/saline lock"; and (2) as entered into the medical record at 10:27 p.m. by Hoyle, "(IV start kit used) Site #1: (20 gauge) IV catheter left hand IV site labeled per protocol" at approximately 10:20 p.m., and "[b]lood obtained from the left hand via IV attempted times 1" at approximately 10:20 p.m. We note that, during the suppression hearing, Hoyle testified that she had "inserted" an IV line into the defendant "soon after" he arrived at the hospital for the purpose of conducting a blood test. We also note, as the court found, that the defendant arrived at the hospital at approximately 9:42 p.m.

We additionally observe that Bugbee questioned the defendant in his hospital room from 10:13 p.m. until 10:42 p.m., as reflected by the time stamps on the video footage from his body camera. Bugbee had activated the body camera when he entered the defendant's hospital room, and its video footage later was admitted into evidence during the suppression hearing. Bugbee testified during the suppression hearing that he "[did not] recall" whether the defendant was "hooked up to any medical equipment" at any point when he questioned the defendant.

Our careful review of the video recordings from Bugbee's body camera reveals that, at 10:13 p.m. and 10:17 p.m.—at which times the defendant's hands and arms momentarily were visible on the video recording—there does not appear to be an IV line or IV port in the defendant's hands or arms. At approximately 10:18 p.m., however, a nurse entered the video frame and spoke with the defendant. Although, between 10:18 p.m. and 10:22 p.m., the video camera was positioned such that a viewer of the video recording is unable to see the defendant's left hand and arm as well as what the nurse was doing, the audio recording from the video reflects that the defendant stated to the nurse at 10:19 p.m., "needles don't affect me." At 10:22 p.m., the nurse visibly exited the frame. At 10:42 p.m.—at which point the defendant's hands once again became visible on the video recording—an IV port, inserted into the defendant's left hand, was visible for the first time.

Because (1) Hoyle testified that she inserted an IV line into the defendant for the purposes of completing a blood test "soon after" he arrived at the hospital, (2) the video footage depicts Bugbee questioning the defendant from 10:13 p.m. until 10:42 p.m., (3) the video footage depicts that, at some point during Bugbee's interview, an IV port was inserted into the defendant's hand, and (4) the medical records reflect that Hoyle inserted an IV line into the defendant at approximately 10:20 p.m., and the record contains no evidence to the contrary, a fair reading of the court's finding that the defendant was attached to an IV line "at the beginning of his treatment" refers to when Hoyle inserted an IV into the defendant at approximately 10:20

p.m., during Bugbee's interrogation of him.

[11] Hatheway's conversation with the defendant was recorded using Bugbee's and Pryputniewicz' body cameras, which Bugbee and Pryputniewicz had activated. The audio and video recordings of the conversation were admitted into evidence as full exhibits during both the suppression hearing and the subsequent criminal trial.

[12] Our review of the record—specifically, the recordings from Bugbee's body camera that were admitted into evidence during the suppression hearing—reveals that, at approximately 12:09 a.m., Bugbee informed the defendant for the first time, and only after the defendant already had been subjected to extensive questioning, that he was "pretty much free to go at any time . . . *with the exception of what the hospital's got to do*"; (emphasis added); and, at approximately 12:25 a.m., Bugbee told the defendant, "I think it's a *hospital policy*, because you've been drinking, that *they can't release you right away. . . . I think you . . . have to wait* [a] *couple of hours until* [*hospital staff*] *say that you're good to go. . . .* [T]hey're going to keep you as long as they have to." (Emphasis added.)

[13] This conversation was not recorded.

[14] During closing argument at the conclusion of the suppression hearing and in his posthearing memorandum of law in support of his motion to suppress, dated May 20, 2019, the defendant clarified that he specifically sought to suppress the statements that he had made to Hicking, Bugbee, Hatheway, and Patrizz between approximately 10 p.m. on June 22, 2018, and 2 a.m. on June 23, 2018. The defendant did not seek to suppress the statements that he made to Roberge, which included the following: he "wasn't in the right" for stabbing Patten; "I mean, look at what he did," while pointing at his nose; and, "I take shit from no one, you swing at me, I'm going to end you."

[15] The defendant additionally contended that the statements were inadmissible because (1) he involuntarily had provided the statements to the police, (2) the statements failed to meet the statutory requirements of General Statutes § 54-1o, (3) the rule of completeness, codified in § 1-5 of the Connecticut Code of Evidence, precluded their admission, and (4) the probative value of the statements was outweighed by the danger of their unfair prejudice pursuant to § 4-3 of the Connecticut Code of Evidence.

[16] The court determined that the defendant was aware of at least one officer outside of his room; at one point during the evening, the defendant summoned Bugbee into the room.

[17] The court nonetheless concluded that "[t]he duration of [the] questioning was not excessive . . . ."

[18] Because it concluded that the defendant had failed to establish that he was in custody, the court declined to consider whether the police had subjected him to interrogation for purposes of *Miranda*.

[19] The defendant affirmatively waived his right to a jury trial on May 7, 2019.

[20] After the state rested, the defendant moved for a judgment of acquittal as to both counts. On July 1, 2019, the court orally denied the defendant's motion as to the first count, assault in the first degree, and granted the motion as to the second count, tampering with physical evidence. In granting the motion as to the second count, the court concluded that no rational fact finder could find, based on the evidence the state had presented, that the defendant had altered, destroyed, concealed, or removed the knife or that he did so with the purpose of impairing its verity or availability as evidence. See General Statutes § 53a-155 (a) (1).

[21] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[22] "We emphasize that the test for whether an interrogation was custodial is an objective one. [T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. . . . The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 198 n.13.

[23] We agree with the state that, because a directive from the hospital staff prohibited the defendant from leaving the hospital premises until he was medically sober, whether a reasonable person in the defendant's position would have believed he was "at liberty to . . . *leave*" *the premises*; (emphasis added; internal quotation marks omitted) *State* v. *Mangual*, supra, 311 Conn. 193; is less applicable to our resolution of this claim than whether a

reasonable person in the defendant's position would have believed he was "at liberty to terminate the interrogation"; (internal quotation marks omitted) id.; and that his freedom of movement was restricted by the police. See id., 194–95.

[24] We recognize that the defendant made some of the statements he later sought to suppress *after* Bugbee had told him that he was free to leave, "as far as the police were concerned." By that point, however, several police officers already had questioned the defendant during a period of more than two hours, and the defendant already had made various inculpatory statements to the police. Further, the defendant was, in fact, *not* free to leave. Bugbee made this fact clear to the defendant when he iterated to him that he was prohibited from leaving the hospital until he regained sobriety, per hospital directive. See footnote 12 of this opinion. Bugbee never explicitly informed the defendant that he was free to terminate the interviews despite informing him that he could not leave the hospital premises until he regained sobriety, per hospital directive.

[25] We acknowledge that, at approximately 12:35 a.m. or 12:40 a.m., the defendant indicated that he did not want to speak to the officers anymore. Nonetheless, in the preceding three hours, during which it is uncontested that the defendant was intoxicated, the police did not inform him that he had the ability to terminate their interviews or to not respond to their questions if he so chose.

[26] We also note that the court stated in its memorandum of decision on the defendant's motion to suppress that "[i]t is true that the defendant . . . may have, in the past, been taking medication for attention deficit hyperactivity disorder, depression and anxiety."

[27] Because the defendant did not challenge the admissibility of the statement he made to Roberge, "I take shit from no one, you swing at me, I'm going to end you," to the extent the court considered this statement, it did so properly. We cannot say, however, that the court, in assessing whether this statement bore on the issue of intent, was not already tainted by the multiple other inculpatory statements that improperly were admitted into evidence during trial. As this court, considering a claim of harmless error of a nonconstitutional dimension, has explained, "[o]ur [harmlessness] inquiry focuses on the impact of the improperly introduced evidence on the . . . perceptions [of the trier of fact] and [the trier of fact's] understanding of the other evidence presented in the case, rather than an analysis of the sufficiency of the remaining evidence to uphold the conviction in the absence of the admission of the [allegedly improperly admitted] evidence . . . ." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 41 Conn. App. 391, 399, 676 A.2d 409 (1996), aff'd, 240 Conn. 317, 692 A.2d 713 (1997); see also *State* v. *Merritt*, 36 Conn. App. 76, 92, 647 A.2d 1021 (1994) (same), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995).

[28] General Statutes § 53a-19, titled "Use of physical force in defense of person," provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he . . . knows that he . . . can avoid the necessity of using such force with complete safety (1) by retreating . . . .

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ."