STATE OF CONNECTICUT *v.* ALEXANDER
A. GARRISON
(SC 20773)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The state appealed, on the granting of certification, from the judgment of
the Appellate Court, which reversed the defendant's conviction of assault
in the first degree. The state claimed that the Appellate Court had incorrectly
determined that a new trial was required because the trial court should
have granted the defendant's motion to suppress certain statements he made
on the ground that he was in custody when he spoke with police officers
in his hospital room without being advised of his rights pursuant to *Miranda*
v. *Arizona* (384 U.S. 436). *Held*:

The Appellate Court incorrectly determined that the defendant was in cus-
tody for *Miranda* purposes when police officers questioned him at the

State *v.* Garrison

hospital, as a reasonable person in the defendant's position would not have felt that there was a restraint on his freedom of movement of the degree associated with a formal arrest.

(*Two justices dissenting in one opinion*)

Argued March 18—officially released July 26, 2024*

*Procedural History*

Information charging the defendant with the crimes of assault in the first degree and tampering with physical evidence, brought to the Superior Court in the judicial district of Tolland, where the court, *Bhatt, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the court, *Seeley, J.*, which granted the defendant's motion for a judgment of acquittal as to the charge of tampering with physical evidence; subsequently, judgment of guilty of assault in the first degree, from which the defendant appealed to the Appellate Court, *Prescott*, *Suarez*, and *Bishop*, *Js.*, which reversed the trial court's judgment and remanded the case for a new trial, and the state, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Jaclyn Preville*, supervisory assistant state's attorney, for the appellant (state).

*Erica A. Barber*, assistant public defender, for the appellee (defendant).

*Opinion*

ROBINSON, C. J. The sole issue in this certified appeal is whether officers from the Vernon Police Department elicited incriminating statements from the defendant, Alexander A. Garrison, during a custodial interrogation in his hospital room without first administering *Miranda*

* July 26, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Garrison

warnings,[1] in violation of his rights under the fifth and fourteenth amendments to the United States constitution. The state appeals, upon our grant of its petition for certification,[2] from the judgment of the Appellate Court, which reversed the judgment of conviction, rendered following a court trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). See *State* v. *Garrison*, 213 Conn. App. 786, 789–90, 841, 278 A.3d 1085 (2022). The state claims that the Appellate Court incorrectly determined that a new trial was required because the trial court[3] should have suppressed the defendant's statements on the ground that he was in custody when he spoke with the police officers in his hospital room without having received *Miranda* warnings. We conclude that the defendant was not in custody during any of his interactions with the police officers at the hospital and, accordingly, reverse the judgment of the Appellate Court.

The record reveals the following relevant facts, either found by the trial court or undisputed,[4] and procedural

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

[2] We granted the state's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the defendant was in custody when he spoke with investigating officers after admitting himself to the hospital?" And (2) "[i]f the answer to the first question is 'yes,' did the Appellate Court correctly conclude that the admission of the defendant's statements while in custody was not harmless beyond a reasonable doubt?" *State* v. *Garrison*, 345 Conn. 959, 285 A.3d 52 (2022).

[3] After the trial court, *Bhatt, J.*, conducted an evidentiary hearing and denied the defendant's motion to suppress, the case was tried to the court, *Seeley, J.*, who rendered the judgment of conviction. All references to the trial court in connection with the motion to suppress that is the subject of this certified appeal are to Judge Bhatt, and references to the trial court in connection with the underlying judgment are to Judge Seeley.

[4] See, e.g., *State* v. *Griffin*, 339 Conn. 631, 655 n.12, 262 A.3d 44 (2021) ("Appellate review of the trial court's resolution of a constitutional claim is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider

State *v.* Garrison

history. In June, 2018, the defendant visited his close friend, Timothy Murphy, and Murphy's cousin, William Patten, who lived together in an apartment located in Vernon. While drinking beer and whiskey, Murphy, Patten, and the defendant watched television, talked, and played their guitars in the living room of the apartment. Eventually, they moved the gathering outside in order to build a fire in a fire pit on the lawn outside of the apartment. As the evening went on, all three continued drinking beer and whiskey. After several hours of drinking around the fire, Patten and the defendant began arguing over the merits of football and mixed martial arts. The argument led to a physical altercation during which Patten and the defendant pushed one another and fell to the ground. Upon gaining an advantage over the defendant, Patten punched the defendant in the face, injuring his nose and ending the initial fight. Patten and the defendant got off the ground and returned to sitting around the fire. After a few minutes, the defendant, who was angry that Patten had punched him, attacked Patten from behind. The defendant stabbed Patten in his back, front shoulder area, and arm with a Smith & Wesson folding knife that he had been carrying in his waistband. Patten, who did not realize that he was being stabbed, pulled the defendant over his shoulder and kicked him away, which ended the second altercation.

Patten then returned to the apartment and, realizing that he needed medical attention, walked to the nearby Rockville General Hospital (hospital). In order to obtain treatment for his injured nose, the defendant also walked to the hospital. The defendant arrived at the hospital at approximately 9:42 p.m. and was wheeled into an examining room, where a nurse evaluated him

undisputed facts established in the record, including the evidence presented at trial." (Internal quotation marks omitted.)), cert. denied, U.S. , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

State *v.* Garrison

and provided medical care. Consistent with hospital policy, the defendant changed into a hospital gown, and hospital staff placed his clothes into bags. After performing basic assessments of the defendant's condition, the nurse "determined that he was alert, awake, and oriented." Although tests confirmed that the defendant's blood alcohol content measured 0.217, he was able to communicate effectively with the nurse and to respond appropriately to her questions, and he was calm and cooperative. The attending physician who was on duty briefly interacted with the defendant and left a note for the incoming attending physician that the defendant could be discharged once he was clinically sober.

During the time that the defendant was at the hospital, he was questioned by and made statements to five different Vernon police officers. The defendant challenges the admissibility of the statement he made to Detective Charles Hicking, the written statement recorded by Officer Thomas Bugbee, the statement he made to Detective Sergeant David Hatheway, and the statement he made to Detective Michael Patrizz.[5] Those police officers collectively questioned the defendant for approximately one hour; they were not all present at once with the defendant.

The first interaction during which the defendant claims to have been in custody was with Hicking. When Hicking entered the defendant's room, a nurse was present. Hicking asked the nurse for permission to speak

_____
[5] The defendant first spoke with Officer Ethan Roberge for approximately five minutes. During this interaction, the defendant, referring to Patten, stated: "I drew a pocketknife, and I sliced him," and "I know that I wasn't in the right for what I did, but, I mean, look what he did," gesturing to his injured nose. During a second interaction with Roberge, which lasted approximately one minute, the defendant stated: "Look what he did to me. What am I gonna do? I take shit from no one. You swing at me, I'm gonna end you." The defendant does not challenge the admissibility of the statements he made to Roberge.

State *v.* Garrison

with the defendant, and the nurse assented. The defendant then told Hicking his version of what had occurred that evening, and Hicking asked clarifying questions. The defendant told Hicking that he had stabbed the victim but that it was in self-defense. The interaction ended when nursing staff interrupted Hicking in order to perform their duties. Later, Hicking reentered the defendant's hospital room with another detective, but he did not interact with the defendant. Hicking was dressed in plain clothes, and his weapon was not visible to the defendant.

The defendant's longest interaction was with Bugbee, a patrol officer, who first entered the defendant's hospital room at 10:13 p.m. During the approximately thirty minute interaction, Bugbee took the defendant's sworn statement. Specifically, the defendant told Bugbee, "I don't flight, I fight," "I'm a peaceable person until you get in my face, then I'll fuck you up," and "I take shit from no one." While the defendant gave his statement, medical personnel entered and exited the hospital room freely and tended to the defendant. At one point, medical personnel asked Bugbee if they could treat the defendant during the interview; at that time, Bugbee confirmed the defendant's desire to continue the interview in the presence of the staff. As the defendant continued to speak with Bugbee, a nurse inserted an intravenous (IV) catheter into the back of the defendant's hand in order to draw blood. The defendant's IV was not attached to any machine or equipment while he spoke with Bugbee.[6] After putting the defendant

_____

[6] The trial court did not make a finding as to how long the IV remained inserted into the back of the defendant's hand. Our review of the body camera footage; see footnote 7 of this opinion; reveals that the IV remained inserted into the back of the defendant's hand until at least 1:05 a.m., which is the last time that the defendant's hand is clearly visible on the recording. Despite the length of time that the IV was inserted, he was able to freely gesticulate and to get up from the hospital bed and walk around the room. There is nothing in the record to suggest that the IV restrained him to the point that a reasonable person would not have felt free to leave.

State *v.* Garrison

under oath and having him sign the statement, Bugbee left the room. At approximately 12:09 a.m., Bugbee reentered the defendant's room to speak with him again. During this brief conversation, Bugbee told the defendant that he was free to go, as far as the police were concerned, but that it was up to the hospital when he could actually leave. At 12:26 a.m., Bugbee repeated to the defendant that the police officers were done speaking with him and that he could leave as soon as the hospital released him. During all of these conversations, Bugbee was in uniform with his weapon visible and his badge displayed.

After briefly reviewing the statement that the defendant had given to Bugbee, Hatheway, a detective sergeant, entered the defendant's hospital room along with both Sergeant Christopher Pryputniewicz and Bugbee. Hatheway was wearing civilian clothes, but his badge and weapon were visible to the defendant. Hatheway interviewed the defendant about his version of events, during which the defendant described the stabbing and stated to the officers that he "take[s] shit from no one." During the interaction, the defendant gave the officers consent to seize and search his clothing, which the medical staff previously had placed into bags. After concluding the interview, Hatheway relayed his impressions to his superior officer and left the hospital.

Finally, the defendant spoke with Patrizz, who was the lead detective assigned to the case. Accompanied by Hicking, Patrizz entered the defendant's hospital room shortly after 12:30 a.m. and asked the defendant to again provide his version of the events. At that time, Patrizz was dressed in plain clothes with his weapon and badge visible to the defendant. The defendant told Patrizz that he had stabbed the victim in his stomach area and upper chest area but that it was in self-defense. After approximately five to ten minutes, the defendant expressed annoyance at having to repeat his story and indicated

State *v.* Garrison

a desire to stop speaking. At that point, Patrizz ended the interaction.

During each interaction with the police officers, the defendant was never physically restrained. No officer asked the medical staff to prolong the defendant's treatment. Although the defendant was intoxicated, he "was coherent, alert, oriented, and able" to understand his circumstances and to communicate effectively. Apart from his injured nose, medical examinations revealed no other medical concerns. After becoming clinically sober, the defendant was discharged from the hospital at 2:25 a.m. At no point during any of their interactions with the defendant at the hospital did the police advise the defendant of his *Miranda* rights.

The police arrested the defendant the following day. The state charged the defendant with one count of assault in the first degree in violation of § 53a-59 (a) (1) and one count of tampering with physical evidence in violation of General Statutes § 53a-155. Thereafter, the defendant moved to suppress portions of the statements that he had made to the officers while he was at the hospital. The defendant argued, among other things, that he was in custody when he was interviewed by the officers and that the questioning constituted an interrogation requiring that the officers advise him of his *Miranda* rights. The trial court conducted a three day evidentiary hearing on the defendant's motion to suppress. Following the conclusion of the hearing, the court issued a memorandum of decision, concluding that the defendant was not in custody when he made the challenged statements, and, accordingly, denied his motion to suppress. Following a bench trial, the court found the defendant guilty on the assault charge. The court sentenced the defendant to ten years of incarceration, execution suspended after seven years, and five years of probation.

The defendant appealed from the judgment of the trial court to the Appellate Court, claiming that the

State *v.* Garrison

statements he made to the police at the hospital were the result of a custodial interrogation and that, because he had not been advised of his *Miranda* rights before the statements were elicited, he was entitled to have the statements suppressed. See *State* v. *Garrison*, supra, 213 Conn. App. 807. The Appellate Court concluded that "a reasonable person in the defendant's position would have believed that he was not at liberty to terminate the police questioning, that his freedom of movement was restricted by the police . . . and that [he] was in police custody to the degree associated with a formal arrest . . . ." (Citation omitted; internal quotation marks omitted.) Id., 827. It further concluded that "the police officers' questioning of the defendant constituted [an] interrogation for purposes of *Miranda*" and, therefore, that evidence of the statements should have been suppressed. Id. Upon concluding that the admission of the statements obtained in violation of *Miranda* was not harmless beyond a reasonable doubt, the Appellate Court reversed the judgment of the trial court and remanded the case for a new trial. See id., 840–41. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the state claims that the Appellate Court incorrectly concluded that the defendant's statements were obtained in violation of his *Miranda* rights. The state argues that an examination of the totality of the circumstances in this case demonstrates that the defendant did not establish that a reasonable person would believe that he was in custody of the degree associated with a formal arrest when the police officers spoke with him at the hospital. See, e.g., *State* v. *Jackson*, 304 Conn. 383, 417, 40 A.3d 290 (2012). In response, the defendant contends that the Appellate Court correctly concluded that he was in custody when he spoke with the officers in his hospital room. He argues that, because the officers interrogated him while he was undergoing

State *v.* Garrison

medical treatment and physically confined to the hospital, a reasonable person in his position would not have believed that he was free to leave or to terminate the interview. According to the defendant, the officers were therefore required to inform him of his *Miranda* rights before they questioned him. We, however, agree with the state and conclude that the Appellate Court incorrectly determined that the defendant was in custody for *Miranda* purposes when the police officers questioned him at the hospital.

We begin with the standard of review applicable to a trial court's determination of whether a person was in custody for *Miranda* purposes. " 'The trial court's determination of the historical circumstances surrounding the defendant's interrogation [entails] findings of fact . . . [that] will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo.' . . . In other words, we are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody." (Citation omitted.) *State* v. *Mangual*, 311 Conn. 182, 197, 85 A.3d 627 (2014), quoting *State* v. *Jackson*, supra, 304 Conn. 417.

Well established principles of law frame our custody analysis. "Although [a]ny [police] interview of [an indi-

State *v.* Garrison

vidual] suspected of a crime . . . [has] coercive aspects to it . . . only an interrogation that occurs when a suspect is in custody heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. . . . This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . . Thus, the court in *Miranda* was concerned with protecting defendants against interrogations that take place in a [police dominated] atmosphere, containing inherently compelling pressures [that] work to undermine the individual's will to resist and to compel [the individual] to speak . . . . [P]olice officers [however] are not required to administer *Miranda* warnings to everyone whom they question . . . . [R]ather, they must provide such warnings only to persons who are subject to custodial interrogation. . . . To establish entitlement to *Miranda* warnings, therefore, the defendant must satisfy two conditions, namely, that (1) [the defendant] was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 191–92.

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would not] have felt . . . at liberty to terminate the interrogation and [to] leave. . . . Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not

State *v.* Garrison

all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the [freedom of movement] inquiry . . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'' (Citations omitted; internal quotation marks omitted.) Id., 193.

"Of course, the clearest example of custody for purposes of *Miranda* occurs when a suspect has been formally arrested. As *Miranda* makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested *or* otherwise deprived of his freedom of action *in any significant way*. . . . Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes; in other words, the [freedom of movement] test identifies only a necessary and not a sufficient condition for *Miranda* custody. . . . Rather, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [that person's] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address.'' (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 194–95. "No definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the [court in] *Miranda* . . . expressed concern with protecting defendants against interrogations that take place in a [police dominated] atmosphere . . . circumstances relating to those kinds of concerns are highly relevant on the cus-

State *v.* Garrison

tody issue.'' (Citation omitted; internal quotation marks omitted.) *State* v. *DesLaurier*, 230 Conn. 572, 577–78, 646 A.2d 108 (1994).

Thus, in *State* v. *Mangual*, supra, 311 Conn. 182, we identified ''the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public.'' Id., 196–97.

Additionally, in *State* v. *Jackson*, supra, 304 Conn. 383, we identified various factors that courts have considered in determining whether a defendant was in custody for *Miranda* purposes when, as here, the defendant had been questioned by the police in a hospital room. Those factors include (1) ''whether the police physically restrained the defendant in any way or ordered the medical attendants to restrain him physically,'' (2) ''whether the police took advantage of an inherently coercive situation created by any physical restraint that the medical attendants may have asserted against him for purposes of his treatment,'' (3) ''whether the defendant was able to converse with . . . other people, express annoyance or request assistance from them,'' (4) ''the duration of the questioning,'' (5) ''whether the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the [hospital room] door,

State *v.* Garrison

[or] arranged an extended treatment schedule with the doctors,'' (6) "the time of day,'' (7) "the mood and mode of the questioning,'' (8) "whether there were indicia of formal arrest,'' and (9) "the defendant's age, intelligence and mental makeup.'' (Internal quotation marks omitted.) Id., 417–18.

With these principles in mind, we now consider whether the defendant was in custody when he spoke with the various police officers in his hospital room. At the outset, we observe that the defendant was not handcuffed while in his hospital room or placed under arrest before or during his hospital stay. Accordingly, we must decide whether the officers otherwise restrained the defendant to the degree associated with a formal arrest. See, e.g., *State* v. *Mangual*, supra, 311 Conn. 194. We conclude, after reviewing the nonexclusive factors from *Mangual* and *Jackson*, that the defendant was not restrained to such an extent during any of his interactions with the officers.

Turning to the first *Mangual* factor, we note that our review of the footage from the body cameras the police officers were wearing[7] demonstrates that the trial court correctly determined that "the questioning was neither prolonged nor aggressive . . . .'' (Citation omitted.) *State* v. *Jackson*, supra, 304 Conn. 418. The defendant was questioned by five different officers, and he responded "spontaneously, eagerly, and immediately, often launching into long narratives of the event and having to be redirected and asked to slow down.'' When the defendant became annoyed by the questioning and indicated a desire to stop talking, the interview was immediately terminated.

---

[7] Roberge, Bugbee, and Pryputniewicz were wearing body cameras, which recorded the various conversations between the defendant and the officers. See *State* v. *Garrison*, supra, 213 Conn. App. 796 n.6, 797 n.8, 798 n.9, 801 n.11. The audio and video recordings, or portions thereof, were admitted into evidence during the suppression hearing and at the subsequent criminal trial. See id.

State *v.* Garrison

Because there is nothing in the record to suggest that any of the officers with whom the defendant interacted were threatening or aggressive, we conclude that the tone and tenor of the questioning weigh against a conclusion that the defendant was restrained to the degree associated with formal arrest. See, e.g., *State* v. *Brandon*, 345 Conn. 702, 730–31, 287 A.3d 71 (2022), cert. denied,  U.S.  , 143 S. Ct. 2669, 216 L. Ed. 2d 1242 (2023). Additionally, although the defendant was at the hospital for more than four and one-half hours, his actual interactions with the police officers were spaced out and totaled only about one hour, which our cases indicate is not excessive under the circumstances. See, e.g., id., 731–32 (ninety minute duration of interrogation weighed against conclusion that defendant was in custody); *State* v. *Pinder*, 250 Conn. 385, 414, 736 A.2d 857 (1999) (two and one-half hour interview did "not necessitate the conclusion that a reasonable person would believe he could not leave").

The second *Mangual* factor also weighs against a conclusion that the defendant was restrained to the degree associated with a formal arrest. In his hospital room, the defendant was neither handcuffed nor physically restrained by the police officers or by the medical staff at the request of the officers. Although the defendant had an IV inserted into the back of his hand, there is nothing in the record to suggest that the officers "took advantage" of what could have been a "coercive situation created by [the] physical restraint" placed on the defendant for purposes of medical treatment. *State* v. *Des-Laurier*, supra, 230 Conn. 579. The officers did not increase the intensity of the questioning or stand in the defendant's personal space in order to intimidate him. Indeed, the defendant was able to get up from his hospital bed and walk around the room.

The third *Mangual* factor, namely, whether the police officers explained that the defendant was either free to leave or not under arrest, presents a closer question

State *v.* Garrison

but nonetheless weighs against a finding of custody. On two occasions, at 12:09 and 12:26 a.m., Bugbee informed the defendant that he was free to leave for police purposes. The defendant argues that, because the officers did not tell him that he was free to leave for police purposes until 12:09 a.m., he was not free to leave before then and, therefore, was in custody. This court, however, previously has "recognized that, as long as the facts demonstrate that a reasonable person in the defendant's position would understand that his meeting with law enforcement is consensual, a defendant need not be expressly informed that he [is] free to leave in order for a court to conclude that the defendant has failed to prove that an interrogation was custodial." (Internal quotation marks omitted.) *State* v. *Brandon*, supra, 345 Conn. 736. Indeed, "[d]rawing the conclusion that an interrogation was custodial from the failure to advise . . . a defendant that he is free to leave or not under arrest misunderstands the two-pronged nature of the *Miranda* custody inquiry." Id. It is particularly noteworthy that, in the present case, the defendant was not placed under arrest at the conclusion of the police interactions.[8] See, e.g., *Howes* v. *Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012) (relevant factors to consider in determining "how a suspect would have gauge[d] his freedom of movement" include "the release of the interviewee at the end of the questioning" (internal quotation marks omitted)); *State* v. *Brandon*, supra, 738 (fact that "the defendant left without being placed under arrest . . . weighs against the

---

[8] As we recently acknowledged in *State* v. *Brandon*, supra, 345 Conn. 739 n.18, there is "tension with placing significant weight on this factor given that a suspect may not know at the outset of or during a particular interrogation whether he will be permitted to leave at the end of the interrogation. However, both the United States Supreme Court and this court have considered this factor in the totality of the circumstances that bear on a custody determination. Thus, although we do not place great weight on this factor, we nevertheless consider it in accordance with long-standing, established precedent in this area."

State *v.* Garrison

conclusion that the defendant was restrained to the degree associated with a formal arrest'').

The fourth *Mangual* factor, namely, who initiated the interactions, weighs in favor of a conclusion that the defendant was in custody because the police officers initiated each of the interactions. ''Its weight is undercut, however, by the defendant's acquiescence to'' each interaction. *State* v. *Brandon*, supra, 345 Conn. 739. As the trial court found, the defendant was eager to tell his story and even thanked Bugbee for writing down his statement. Most significant, the officers stopped questioning the defendant when the defendant expressed annoyance at having to repeat his story and indicated a desire to stop.

In analyzing the fifth *Mangual* factor, which focuses on the location of the interview, we consider the factors articulated in *State* v. *Jackson*, supra, 304 Conn. 417–18, which poses additional considerations relevant to police interviews that take place in a hospital setting.[9] As we previously discussed, the police officers neither physically restrained the defendant nor asked medical personnel to do so. Although an IV was inserted into the back of the defendant's hand for purposes of his treatment, there is nothing in the record to suggest that the officers took advantage of whatever restraint was

---

[9] We note that, consistent with hospital policy, the defendant had changed out of his clothes and was wearing a hospital gown and underwear during each of his interactions with the police officers. With the defendant's written consent, his clothes were then seized by the officers. We recognize that, in certain situations, a reasonable person in a hospital gown whose clothes were seized by the police might feel restrained to the degree associated with a formal arrest, and we emphasize that our conclusions in the present case should not be read to mean that an individual in such a situation could never be in custody for purposes of *Miranda*. In the present case, however, the record does not support such a conclusion. The defendant took no issue with the officers' seizing his clothes and willingly signed a form consenting to the seizure. Additionally, after the seizure, the mood of the questioning did not become aggressive or accusatory, and the defendant continued to speak with police eagerly.

caused by the administration of the IV, such as by increasing the intensity of their questioning of the defendant. The record further demonstrates that the defendant was able to converse with other people, namely, the hospital's medical staff, and was able to express annoyance. Indeed, the police interactions ended as soon as the defendant expressed his annoyance to Patrizz about having to repeat his story multiple times. Although the fact that the defendant's interactions with the officers occurred between 9:40 p.m. and 2:20 a.m. could well weigh in favor of a finding of custody, the time of day, without more, is not enough to show that the defendant was in custody in this case, particularly because "the questioning was neither prolonged nor aggressive . . . ." (Citation omitted.) Id., 418. The defendant's overall interactions with the officers during that span of time totaled approximately one hour, during which the defendant appeared relaxed and even eager to provide his version of the events.

Most significant, the police had no role in causing the hospitalization of the defendant. The police did not transport the defendant to the hospital from the scene of the crime; the defendant walked to the hospital and admitted himself. See, e.g., id., 418–19; see also *United States* v. *Martin*, 781 F.2d 671, 673 (9th Cir. 1985) ("[i]f the police took a criminal suspect to the hospital from the scene of a crime . . . law enforcement restraint amounting to custody could result"). There is nothing in the record to indicate that an officer was stationed outside of the hospital room door in order to monitor the defendant's stay or that the officers arranged an extended treatment schedule with the medical staff in order to keep the defendant at the hospital. There were no indicia of formal arrest, such as handcuffing or anything resembling the booking process. Finally, although the defendant had a tenth grade education and a blood alcohol content of 0.217 when he arrived at the hospital,

State *v.* Garrison

he was "alert, awake, and oriented" at all relevant times. He was able to communicate effectively with medical staff and the police officers, to respond appropriately to questions, and was cooperative. Accordingly, we conclude that the fifth *Mangual* factor weighs against a conclusion that the defendant was in custody.

With respect to the sixth *Mangual* factor, the length of the encounter, the defendant was at the hospital from approximately 9:40 p.m. until approximately 2:25 a.m. and was not permitted to leave prior to 2:25 a.m. for medical reasons, namely, that he was not clinically sober. Although such a length of time could, in certain situations, weigh in favor of a conclusion that the defendant was in custody, the weight of this factor is undercut in this case by the fact that nothing in the record suggests that the police officers arranged with medical staff to increase the length of the defendant's stay or that the officers took advantage of the fact that the defendant was required to stay at the hospital until he was clinically sober. We agree with the trial court that, although "the defendant was physically confined to the hospital until medical [staff] deemed that it was medically appropriate for him to be discharged, the evidence does not demonstrate that a reasonable person in the defendant's position would [have] believe[d] that he or she was in police custody of the degree associated with a formal arrest."

The seventh, eighth, and ninth *Mangual* factors together—which consider coercive factors, such as the number of officers in the immediate vicinity of the questioning, whether they were armed, and whether they displayed their weapons or used force of any other kind before or during the questioning—present a close question but ultimately weigh against a conclusion that the defendant was in custody. Although six different police officers entered the defendant's room at various times during his hospital stay, at no point were all six in

State *v.* Garrison

the room at the same time. Looking at each interaction separately, we observe that the defendant interacted with both Hicking and Bugbee one-on-one,[10] he interacted with Patrizz while one other officer was present in the hospital room, and he interacted with Hatheway while two other officers were in the room. Without more, the number of officers in the defendant's hospital room at any time did not create a police dominated environment to the point that a reasonable person in the defendant's position would have believed that he was in police custody of the degree associated with a formal arrest. See, e.g., *State* v. *Brandon*, supra, 345 Conn. 732 (fact that "only two police officers" interrogated defendant supported conclusion that defendant was not in custody); *State* v. *Castillo*, 329 Conn. 311, 330–31, 186 A.3d 672 (2018) (fact that "only three officers" were present supported conclusion that defendant was not in custody (internal quotation marks omitted)); *State* v. *Kirby*, 280 Conn. 361, 394, 908 A.2d 506 (2006) ("the defendant did not carry his burden of proving that he was in custody" when he was questioned by five police officers in his home). Although the majority of the officers with whom the defendant interacted were visibly armed, none of the officers "physically threatened the defendant, used force . . . or brandished [his weapon]." *State* v. *Brandon*, supra, 732.

With respect to the tenth *Mangual* factor, there is nothing in the record to support the conclusion that the defendant was isolated from friends, family, and the public to the degree that a reasonable person would have felt a restraint on his freedom of movement akin to a formal arrest. The medical staff came in and out of the room while the police officers questioned the defendant. See *State* v. *DesLaurier*, supra, 230 Conn.

---

[10] We note that the defendant also interacted with Roberge one-on-one. See footnote 5 of this opinion. The defendant does not challenge the admissibility of the statements he made to Roberge.

State *v.* Garrison

580 ("the presence of witnesses who were not police officers," namely, medical staff, weighed against finding of custody). Specifically, Hicking asked the medical staff for permission to speak with the defendant, and Bugbee confirmed with the defendant that he was comfortable talking with the medical staff present. None of the officers asked the medical staff to stop administering treatment or to stay out of the room while they spoke with the defendant. Furthermore, although no friends or family members were present, there is nothing in the record to support a finding that the officers would have barred family or friends from entering the hospital room.

Our conclusion that the defendant was not in custody is supported by our decision in *State* v. *Jackson*, supra, 304 Conn. 383. In *Jackson*, a police officer questioned the defendant, John Jackson, who had attempted to die by suicide by jumping out of a hotel window, for approximately thirty minutes in the hospital room where he was being treated before advising Jackson of his *Miranda* rights. Id., 387–88, 414–15. Jackson had broken legs, a broken arm, and bandages on his head and on one of his hands, and he was receiving IV pain medication. Id., 388, 414. During the interaction, Jackson did not indicate that he did not want to speak to the police officer, and the police officer did not tell Jackson that he was under arrest. Id., 414. In concluding that Jackson was not in custody for purposes of *Miranda*, we noted that (1) he "was immobilized for medical treatment, not for purposes of interrogation," (2) "there was no evidence that [he] could not have asked the police to leave the hospital room or asked hospital personnel to assist him to terminate the questioning," (3) "the police did not arrange for any restraints on or extended treatment of [him] by medical personnel," (4) "the questioning was neither prolonged nor aggressive," (5) the police officer "told [him] that he was not under

State *v.* Garrison

arrest,'' and (6) there was "no evidence that his age or intelligence rendered him especially vulnerable to police intimidation and, although he may have been despondent and was receiving pain medication for his injuries, the nurse indicated that he was capable of speaking with the police, and [the police officer] testified that he was alert and coherent.'' Id, 418–19.

In its opinion in this case, the Appellate Court attempted to distinguish *Jackson*, insofar as it concluded that the larger police presence in the present case transformed the defendant's hospital room into a police dominated atmosphere and that the longer duration of the questioning in the present case transformed the interactions into the prolonged and aggressive questioning about which *Miranda* and our case law are concerned. See *State* v. *Garrison*, supra, 213 Conn. App. 826–27. We disagree. As we discussed previously, a significant portion of the questioning of the defendant occurred with only one police officer in the hospital room, and at no point during the questioning were more than three officers present in the room. Our cases do not suggest that the presence of one, two, or three police officers creates a police dominated atmosphere. See, e.g., *State* v. *Castillo*, supra, 329 Conn. 330–31 (fact that "only three officers" were present supported conclusion that defendant was not in custody (internal quotation marks omitted)). As to the duration of the questioning, our cases do not suggest that approximately one hour of questioning weighs in favor of a finding of custody. See, e.g., *State* v. *Brandon*, supra, 345 Conn. 731–32 (ninety minute duration of interrogation weighed against conclusion that defendant was in custody).

Our conclusion that the defendant was not in custody finds further support in decisions from other states.[11]

---

[11] We note that the Appellate Court relied on various decisions from other jurisdictions to support its conclusion that the defendant was in custody. See *State* v. *Garrison*, supra, 213 Conn. App. 812–13. Our review of these cases indicates that they are factually distinguishable, and the Appellate

State *v.* Garrison

For example, in a very recent case, *Bowman* v. *Commonwealth*, 686 S.W.3d 230, 242 (Ky. 2024), the Kentucky Supreme Court concluded that a defendant who had been questioned at a hospital was not in custody for purposes of *Miranda*. In considering the totality of the circumstances surrounding the questioning, the Kentucky Supreme Court observed that (1) the questioning "took place in a bustling emergency room treatment area while several nurses administered various means of medical treatment," (2) the police officer did not "attempt to clear the room or [to] stop treatment so that he could question [the defendant]," (3) the police officer "waited until there was a lull in treatment before he began asking questions," (4) the questions "were asked in a professional and [nonaccusatory] manner," (5) the defendant "was not handcuffed or otherwise

Court's reliance on them was misplaced. See, e.g., *Reinert* v. *Larkins*, 379 F.3d 76, 80 (3d Cir. 2004) (defendant was questioned in ambulance while IV was inserted into his arm and he was "hooked up to an electrocardiograph"), cert. denied sub nom. *Reinert* v. *Wynder*, 546 U.S. 890, 126 S. Ct. 173, 163 L. Ed. 2d 201 (2005); *United States* v. *Hallford*, 280 F. Supp. 3d 170, 173, 180 (D.D.C. 2017) (defendant was questioned in psychiatric hospital where he was involuntarily committed), aff'd, 756 Fed. Appx. 1 (D.C. Cir. 2018); *People* v. *Mangum*, 48 P.3d 568, 571–72 (Colo. 2002) (defendant was handcuffed while being questioned); *State* v. *Lowe*, 81 A.3d 360, 366 (Me. 2013) (police officer's questioning was "focused, aggressive, and insistent"); *People* v. *Turkenich*, 137 App. Div. 2d 363, 367, 529 N.Y.S.2d 385 (1988) (defendant with diminished mental capacity was questioned in psychiatric ward of hospital where he was confined pursuant to involuntary commitment order); *People* v. *Tanner*, 31 App. Div. 2d 148, 149, 295 N.Y.S.2d 709 (1968) (defendant was "undergoing intravenous feeding and was physically incapable of movement"); *Commonwealth* v. *D'Nicuola*, 448 Pa. 54, 58, 292 A.2d 333 (1972) (questioning was of "[an] accusatory nature"); *Commonwealth* v. *Whitehead*, 427 Pa. Super. 362, 369, 629 A.2d 142 (1993) (defendant "was not freely capable of leaving and was fearful of not cooperating"); *Scales* v. *State*, 64 Wis. 2d 485, 492, 219 N.W.2d 286 (1974) (defendant was questioned in hospital after police placed him under arrest). In the present case, the questioning was not aggressive, insistent, or of an accusatory nature, the defendant was never handcuffed or formally arrested at the hospital, he was not connected to machines and was able to move freely, he did not appear to be fearful of not cooperating and, indeed, was eager to speak with the police officers, and he voluntarily admitted himself to the hospital.

State *v.* Garrison

restrained,'' and (6) the defendant "was not told that he was under arrest or that he could not leave.'' Id. In the present case, the police officers also questioned the defendant while nurses were present and administering treatment, the interactions between the officers and the defendant were professional and nonaccusatory, the defendant was never handcuffed or otherwise restrained, and the defendant was not told by the officers that he was under arrest or that he could not leave. See id.; see also *Freeman* v. *State*, 295 Ga. 820, 823, 764 S.E.2d 390 (2014) (defendant, who was in hospital being treated for gunshot wounds, was not in custody because "he was not under arrest; he was not restrained in any way; and if he had wished, he would have been allowed to leave if his medical situation so permitted''); *State* v. *Warrior*, 294 Kan. 484, 497–98, 502–503, 277 P.3d 1111 (2012) (although defendant's injuries prevented her from leaving hospital room, she was not in custody because "the interviews occurred in [the defendant's] hospital room, a neutral location,'' "[t]he interviews were short in duration,'' "[t]he officers did not use coercive threats or employ a hostile or accusatory tone,'' defendant was not restrained by officers, defendant "was taken to the hospital for treatment, not by order of law enforcement,'' and defendant was not arrested after interviews); *State* v. *Rogers*, 848 N.W.2d 257, 265 (N.D. 2014) ("[The defendant] voluntarily spoke with the officers, he was free to move about, the atmosphere of the interview was conversational, and the interview took place in a large, [well lit] room far removed from the coercive confines traditionally associated with [station house] interviews. Furthermore, during the interview, hospital staff checked on [the defendant] periodically.'').

We emphasize that our conclusions in the present case should not be read to mean that an individual can never be in custody for purposes of *Miranda* when questioned in a hospital room. Indeed, "[a] reasonable

State *v.* Garrison

person observing a police officer's uniform, badge, holstered gun, and command of individuals . . . in the [hospital or] emergency room could conclude that the officer has some measure of authority over medical personnel. Any doubt in such a matter must cut in favor of the defendant, who depends on undelayed, uninterrupted, and unrestricted medical care to treat pain, prevent complication, and save life." K. Berger, Note, "In Whose Custody? *Miranda*, Emergency Medical Care & Criminal Defendants," 11 U.C. Irvine L. Rev. 1197, 1208 (2021). In the present case, however, there is nothing in the record to suggest that a reasonable person in the defendant's situation would have perceived the police officers to be exercising any control or authority over the medical staff. Indeed, the record demonstrates that the officers did not assert control over the medical staff and that the questioning did not delay, interrupt, or restrict the defendant's medical care.

In sum, after evaluating the totality of the circumstances with respect to each interaction that the defendant had with the police officers in his hospital room during which he made the challenged statements, we conclude that a reasonable person in the defendant's position would not have felt that there was a restraint on his freedom of movement of the degree associated with a formal arrest. The defendant was, therefore, not in custody, and the police officers were not required to administer *Miranda* warnings. Accordingly, we conclude that the Appellate Court incorrectly determined that the defendant was in custody for purposes of *Miranda*, thus requiring it to reverse the trial court's denial of the defendant's motion to suppress.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion D'AURIA, MULLINS, ALEXANDER and DANNEHY, Js., concurred.

State *v.* Garrison

McDONALD, J., with whom ECKER, J., joins, dissenting. This court today sets the troubling precedent that an intoxicated person admitted to a hospital for medical treatment, attached to an intravenous catheter (also called a IV), and informed that he should not leave until he has reached the point of medical sobriety, and subjected to a cumulative hour of questioning over a period of approximately four hours by five separate police officers, many of whom were in uniform or visibly carrying weapons, is nevertheless not in custody for purposes of *Miranda*.[1]

In this certified appeal, this court must consider whether the defendant, Alexander A. Garrison, was in custody when he spoke with police officers during his admission to, and treatment in, the hospital. See *State* v. *Garrison*, 345 Conn. 959, 285 A.3d 52 (2022). Further, if he was in custody, we must consider whether the trial court's admission of the statements the defendant made during that interaction with the police was harmless beyond a reasonable doubt. See id. The Appellate Court reversed the trial court's judgment and remanded the case for a new trial after determining that the defendant was in custody when he spoke with the police. See *State* v. *Garrison*, 213 Conn. App. 786, 790, 841, 278 A.3d 1085 (2022). The Appellate Court also determined that the improper admission of these statements was not harmless beyond a reasonable doubt. See id., 790, 832, 840–41. I agree with the reasoning of the Appellate Court and would affirm its judgment.

The opinion of the Appellate Court thoroughly and accurately sets forth the facts and evidence considered by the trial court. The state contends that the Appellate Court's judgment should be reversed because a "reasonable person in the defendant's position would not believe

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that he was in police custody," specifying, among other factors, that the defendant voluntarily sought admission at the hospital, he was never restrained or any restraint was "minor," and, although the defendant spoke with a total of five police officers, the majority of the time, he spoke with only a single officer. The state also argues that the Appellate Court erred in finding that the admission of the statements was not harmless beyond a reasonable doubt because "the state's case was very strong and supported by overwhelming evidence . . . ." The defendant contends that the Appellate Court correctly determined that he was in custody when he spoke with police officers after admitting himself to the hospital and that the state has failed to demonstrate that the improper admission of the defendant's statements was harmless beyond a reasonable doubt.

My examination of the record and briefs, and consideration of the parties' arguments, persuades me that this court should affirm the Appellate Court's judgment. Because the Appellate Court's well reasoned opinion fully addresses both of the certified issues in this appeal, it would serve no useful purpose for me to repeat the discussion contained in that opinion. I therefore adopt the Appellate Court's opinion as the proper statement of the issues and the applicable law and reasoning concerning both issues. See, e.g., *State* v. *Henderson*, 330 Conn. 793, 799, 201 A.3d 389 (2019).

Accordingly, I respectfully dissent.

———————————————